## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **DALLAS ROADSTER, LIMITED** | § | **BANKRUPTCY NO. 11-43725** |
| and | § | |
| **IEDA ENTERPRISE, INC.** | § | **BANKRUPTCY NO. 11-43726** |
| | § | |
| **DEBTORS** | § | Chapter 11 |
| | § | |
| **TEXAS CAPITAL BANK, N.A.** | § | |
| | § | |
| **V.** | § | Adversary No. 13-4033 |
| | § | |
| **DALLAS ROADSTER, LTD., IEDA** | § | |
| **ENTERPRISE, INC., BAHMAN KHOBAHY,** | § | |
| **and BAHMAN HAFEZAMINI** | | |

### DEFENDANT BEN AMINI'S ORIGINAL ANSWER AND COUNTERCLAIM

COMES NOW Defendant BEN AMINI and files his Original Answer and Counterclaim
and shows the Court as follows:

### ORIGINAL ANSWER

1. Defendant/Counter-Plaintiff admits the allegations in Paragraph number 1.

2. Defendant/Counter-Plaintiff admits the allegation in Paragraph number 2.

3. Defendant/Counter-Plaintiff admits the allegations in Paragraph number 3.

4. Defendant/Counter-Plaintiff admits the allegation in Paragraph number 4.

5. Defendant/Counter-Plaintiff admits the allegation in Paragraph number 5.

6. Defendant/Counter-Plaintiff denies that this Court has jurisdiction over this case, all

   subject to the Supreme Court's ruling in *Stern v. Marshall*, 131 S.Ct. 2594 (2011).

BKR397

7.  Defendant/Counter-Plaintiff denies that venue is proper, all subject to the Supreme

    Court's ruling in *Stern v. Marshall*, 131 S.Ct. 2594 (2011).

8.  There are no allegations of fact that require a denial or admission in Paragraph number 8.

9.  Defendant/Counter-Plaintiff admits the allegations in Paragraph number 9 regarding the

    Promissory Note in the principal amount of $4,000,000.00.

10. Defendant/Counter-Plaintiff admits allegations in Paragraph number 10 regarding the

    Loan Agreement executed on or about June 27, 2008.

11. Defendant/Counter-Plaintiff admits the allegations in Paragraph number 11 regarding the

    Unlimited Guaranties.

12. Defendant/Counter-Plaintiff admits the allegations in Paragraph number 12.

13. Defendant/Counter-Plaintiff admits the allegations in Paragraph number 13.

14. Defendant/Counter-Plaintiff can neither admit nor deny the allegations of Paragraph

    number 14 because he lacks knowledge or information sufficient to form a belief as to

    Plaintiff's allegation.

15. Defendant/Counter-Plaintiff can neither admit nor deny the allegations of Paragraph

    number 15 because he lacks knowledge or information sufficient to form a belief as to

    Plaintiff's allegation.

16. Defendant/Counter-Plaintiff can neither admit nor deny the allegations of Paragraph

    number 16 because he lacks knowledge or information sufficient to form a belief as to

    Plaintiff's allegation.

---

Ben Amini's Original Answer and Counterclaim                                    Page 2

17. Defendant/Counter-Plaintiff can neither admit nor deny the allegations of Paragraph number 17 because he lacks knowledge or information sufficient to form a belief as to Plaintiff's allegation.

18. Defendant/Counter-Plaintiff admits the allegations regarding Section 9.1 of the Loan Agreement and its contents in Paragraph number 18.

19. Defendant/Counter-Plaintiff denies the allegation that Dallas Roadster or its agents willfully breached covenants in the Loan Agreement, as such it further denies that TCB's rights were adversely affected nor did it institute a default.

20. Defendant/Counter-Plaintiff denies that they were provided with notice of acceleration prior to the receivership being granted. Further Defendant/Counter-Plaintiff denies that he was given notice of the above described defaults. Defendant/Counter-Plaintiff admits that he was given notice of default on or about October 26, 2011 with a letter bearing such date. That letter's only described default pertained to the alleged alternative financing, which Dallas Roadster sought on the advice of TCB's Paul Noonan. However, they never activated this alternative financing per a conversation that Ben Amini had with Noonan following Amini's receipt of the above described October 26, 2011 letter. Amini understood that conversation quelled any concern the Bank might have had over any alleged defaults. Defendant/Counter-Plaintiff can neither admit nor deny the remaining allegations of Paragraph number 20 because he lacks knowledge or information sufficient to form a belief as to Plaintiff's allegations.

---

BKR399

21. Defendant/Counter-Plaintiff denies that all conditions precedent to the Bank's recovery have occurred. The remaining allegations in Paragraph number 21 are not allegations of fact and thus do not require an admission or denial.

22. Defendant/Counter-Plaintiff denies that he failed to comply with agreements and obligations as set forth in the Loan Documents. The remaining allegations in Paragraph number 22 are not allegations of fact and thus to not require an admission or denial.

23. Defendant/Counter-Plaintiff denies that all conditions precedent to the Bank's recovery have occurred. The remaining allegations in Paragraph number 23 are not allegations of fact and thus do not require an admission or denial.

24. Defendant/Counter-Plaintiff denies that all conditions precedent to the Bank's recovery have occurred. The remaining allegations in Paragraph number 24 are not allegations of fact and thus do not require an admission or denial.

25. There are no allegations of fact that require a denial or admission in Paragraph number 25.

26. Defendant/Counter-Plaintiff denies the allegations as stated in Paragraph number 26. It is Defendant/Counter-Plaintiff's belief that the search warrant was still being executed at 9:36 am on November 16, 2011, the time TCB filed its Receivership.

27. Defendant/Counter-Plaintiff admits that TCB has certain rights in the event of a default under Section 9.2 of the Loan Agreement. However, Defendant/Counter-Plaintiff denies that Section 9.2 of the Loan Agreement was triggered here since no event of default had occurred, at the time the Receivership was filed.

---

Ben Amini's Original Answer and Counterclaim                                                    Page 4

28. There are no allegations of fact that require a denial or admission in Paragraph number 28.

29. Defendant/Counter-Plaintiff can neither admit nor deny the allegations of Paragraph number 29 because he lacks knowledge or information sufficient to form a belief as to Plaintiff's allegation.

30. Defendant/Counter-Plaintiff admits that the Bank had certain interests in or rights to certain collateral. However, Defendant/Counter-Plaintiff states that if certain property was in imminent danger of being lost, removed or materially injured, that it was the direct result of the Bank's fabrications about Ben Amini and/or Dallas Roadster, or other TCB wrongful acts. Defendant/Counter-Plaintiff denies that the appointment of a receiver for the purposes stated therein would have benefitted the interests of all Defendants, and also denies that an orderly liquidation of the Personal Property at the location of the Real Property by a qualified receiver, as asserted, increased the likelihood of obtaining the best price. There are no remaining allegations of fact that require a denial or admission in Paragraph number 30.

31. Defendant/Counter-Plaintiff admits that Paragraph number 31 correctly quotes section 9.2 of the Loan Agreement.

32. Defendant/Counter-Plaintiff denies that by executing the Loan Agreement, all interested parties, in effect, have consented to the appointment of a receiver, under the circumstances herein. TCB's pertinent actions were not in good faith. There are no remaining allegations of fact that require a denial or admission in Paragraph number 32.

---

Ben Amini's Original Answer and Counterclaim                                      Page 5

BKR401

33. Defendant/Counter-Plaintiff admits that the Bank is a secured creditor of Dallas Roadster, Ltd. Further, Defendant/Counter-Plaintiff denies that the Bank possessed a reasonable or good faith basis to support an appointment of a receiver. There are no remaining of fact that require a denial or admission in Paragraph number 33.

34. Defendant/Counter-Plaintiff denies that he was in default under the loan documents. Defendant/Counter-Plaintiff denies that the Property was in imminent danger of being materially injured, removed or lost. Further at the time of filing, Defendant/Counter-Plaintiff denies that at the time of filing it was unclear how the Property would be managed, maintained, protected, or disposed of, and that at the time of filing the indictments of Amini and Jimenez were sealed. Thus, TCB could not have reasonably or in good faith believed itself insecure because of said indictments. There are no remaining facts that require a denial or admission in Paragraph number 34.

35. Defendant/Counter-Plaintiff denies that he obtained financing from Automotive Finance Corporation ("AFC") or any other lender other than TCB. Defendant/Counter-Plaintiff further denies that AFC's security interest was reflected in the UCC filing statements which it attached. The date on those statements is October 12, 2011. Since that time TCB has admitted to having had conversations with Ben Amini and cleared any alleged fear of AFC having a secured interest in any of Defendant's, Amini's and/or Khobahy's property.

36. There are no allegations of fact that require a denial or admission in Paragraph number 36.

---

Ben Amini's Original Answer and Counterclaim                                      Page 6

BKR402

37. There are no allegations of fact that require a denial or admission in Paragraph number 37.

38. Defendant/Counter-Plaintiff denies that the Bank had a reasonable basis for the appointment of a receiver.

39. There are no allegations of fact that require a denial or admission in Paragraph number 39.

## ORIGINAL COUNTERCLAIM

### I.
### Parties

1.   Dallas Roadster, Limited, ("DR" or "Dallas Roadster") is a Texas limited partnership, registered and doing business in the state of Texas.

2.   IEDA Enterprise, Incorporated is a Texas corporation, and serves as general partner for DR.  For the purposes of simplicity, in this pleading, unless special reason appears otherwise, both DR and IEDA will be referred to as DR, below.

3.   Bahman Khobahy ("Ben Khobahy" or "Ben K." to avoid confusion with "Ben Amini" or "Ben A.", a co-party) is an individual who resides in Collin County, Texas, and is a co-owner of interests in DR and IEDA.

4.   Bahman Amini ("Ben Amini" or "Ben A." to avoid confusion with "Ben Khobahy" or "Ben K.", a co-party) is an individual who resides in Collin County, Texas and is a co-owner of interests in DR and IEDA.

5.   Texas Capital Bank, N.A. ("TCB" or "Bank"), is a national banking association doing business in Dallas, Texas and this federal division. Texas Capital Bank is a principal subsidiary

BKR403

of Texas Capital Bancshares (NASDAQ: TCBI), a commercial bank that describes itself as

delivering personalized financial services to Texas-based businesses. It was founded December

18, 1998 in Dallas, Texas, with headquarters at 2000 McKinney Avenue, Suite 700, Dallas,

Texas 75201.  It now has other offices in Austin, Fort Worth, Houston, Plano, and San Antonio.

6.      All parties are appearing or have appeared.

## II.
## Jurisdiction and Venue

7.      The Bank's claim is pending in this Court via an order of reference entered by the United

States District Court, Eastern District of Texas, Sherman Division. However,

Defendant/Counter-Plaintiff reserves the right to challenge this Court's authority/jurisdiction to

grant relief on his counterclaims, pursuant to the Supreme Court's decision in *Stern v. Marshall,*

*id.*

## III.
## Facts

A.      **Dallas Roadster's Relationship with TCB**

8.      Dallas Roadster ("DR") at material times was and is a good customer of Texas Capital

Bank ("TCB").  That status has existed since 1999.  Prior to the occurrences that gave rise to this

lawsuit, DR had never had any defaulted loans with TCB. All other loans were paid off, a

majority of them ahead of schedule. Furthermore, for over at least a decade DR had not been late

on payments of loans to TCB.  Likewise, DR had not ever failed to pay other lenders over the

same span. TCB representative(s) indicated that TCB was lucky to have DR as a customer.

BKR404

**B.**    **Relationship of DR and Ben Amini/Ben Khobahy**

9.      At all material times Ben Khobahy ("Ben K.") has served as president of DR's general

partner, IEDA, Inc. and Ben Amini ("Ben A.") has served as vice-president. They have worked

closely together, and have been the most prominent representatives of DR to TCB.  The Bank

was known to and evidenced trust in them until relatively shortly before the declaration of

insecurity.

**C.**    **$4 Million Promissory Note**

10.     In the course of the more than decade long relationship, on or about May 10, 2008 DR, as

Borrower, executed another in a series of promissory notes with TCB, this one in the original

principal amount of $4,000,000.00, with an original maturity date of May 10, 2009. On or about

the same date, DR entered into a Revolving Loan Security Agreement.

**D.**    **Safe Guards TCB had in Place to Heighten the Transparency of DR's Financial
Conditions**

        **(1) Revolving Loan Security Agreement Provided TCB with Full Information**

11.     The Revolving Loan Security Agreement provided TCB with full information which

allowed TCB to be fully informed about its loan and DR's financial condition.

        Article VII Covenants and Agreements:

        *7.1 Affirmative Covenants. Borrower and each Guarantor, as applicable,
        warrant, covenant, and agree until the full and final payment of the Indebtedness
        and the termination of this Agreement, it will do the following:*

                *(a) Books, Financial Statements and Reports. At all times maintain full
        and accurate books of account and records.  Borrower and each Guarantor will,
        on an individual or consolidated basis, as required by Lender, maintain a
        standard and consistent system of accounting and will furnish to Lender the
        statements and reports set forth on Exhibit C attached hereto and made a part
        hereof.*

---

BKR405

(b) *Audits/Inspections.* *On and after the Closing Date, permit representatives appointed by Lender, including independent accountants, agents, attorneys, appraisers and any other persons, to visit and inspect Borrower's property, including its books of account, other books and records, and any facilities or other business assets, and to make extra copies therefrom and photocopies, and photographs thereof, and to write down and record any information such representatives obtain, and Borrower shall permit Lender or its representatives to investigate and verify the accuracy of the information furnished to Lender in connection with the Loan Documents and to discuss all such matters with its officers, employees and representatives.*

*(Revolving Loan Security Agreement p. 12)*

**(2) The Revolving Loan Security Agreement contained certain special financial covenants:**

12.     That agreement gave TCB additional protections:

7.3 *Special Financial Covenants.* *Borrower warrants, covenants and agrees that unless consented to otherwise in writing by Lender, at all times until the full and final payment of the indebtedness and the termination of this agreement:*

(a) *Minimum Tangible Net Worth.* *Borrower's Tangible Net Worth shall not be less than $3,000,000.00.*

(b) *Debt Service Coverage Ratio.* *Borrowers Debt Service Coverage Ratio shall not be less than 1.30 to 1.0.*

*Each of the foregoing covenants shall be measured on a quarterly basis as of the last day of each calendar quarter.*

*(Revolving Loan Security Agreement p.16)*

13.     Under Exhibit B[1], TCB's quarterly Certificate of Compliance, the Covenants are more fully described and split into three parts:

---

[1] Of the Revolving Loan Security Agreement

*(1) Distributions not greater than 40% of the Net Income for any trailing 12 month period ending December 31, 2007, and after*
*(2) Tangible Net Worth of not less than $3,000,000.00*
*(3) Debt Service Coverage Ratio of not less than 1.30 to 1.0.*

*(Revolving Loan Security Agreement p. 29)*

14.     Under Exhibit $C^2$, the Financial Reporting, the financial reporting requirements are also

more fully described and split into five parts:

(i)     *Annual Financial Statements of Borrower. Within 120 days after the last day of each fiscal year of Borrower, beginning with the fiscal year that ends December 31, 2008, reviewed (by a certified public accountant acceptable to Lender) financial statements showing the financial potions and results of operations of Borrower as of, and for the year ended on, such last day, together with the certificate of an Authorized Officer of Borrower that all such financial statements present fairly the financial position of Borrowers as of the last day of such fiscal year and the results of the operations of Borrower for the fiscal year then ended in conformity with GAAP, or other method of accounting acceptable to the Bank. Each such financial statement shall contain at least a balance sheet of Borrower as of the end of such fiscal year and statements of income;*

(ii)    *Annual Financial Statements of Guarantor. As soon as available, and in any event, within thirty (3) days of after the end of each calendar year, complete financial statement of such Guarantor, currently dated, together with all notes thereto, prepared in accordance with sound accounting principles consistent with the financial statements furnished by such Guarantor in connection with the application for the Loan and which fairly reflect the financial condition of Guarantor, certified as true and correct by such Guarantor.  Each financial statement shall contain a balance sheet as of such date and statements of income, of cash flow and of contingent liabilities and such other information as may be reasonably requested by Lender.*

(iii)   *Quarterly Financials; Certificate of Compliance. As soon as available and in any event within forty-five (45) days after the end of each calendar quarter, (a) quarterly financial statements of Borrower together with all notes thereto, prepared in accordance with sound accounting principles*

---

[2] Of the Revolving Loan Security Agreement

Ben Amini's Original Answer and Counterclaim                                        Page 11

*consistent with the financial statement furnished by Borrower in connection with the application for the Loan and which fairly reflect the financial condition of Borrower, certified as true and correct by the chief financial officer of Borrower, which financial statements shall contain a balance sheet as of the end of such calendar quarter and statements of earnings and of changes in stockholder's equity for such calendar quarter, and (b) a Certificate of Compliance, duly executed by Borrower, certifying that Borrower is in full compliance with each of the covenants set forth herein and that there is no Event of Default and no Potential Event of Default has occurred.*

(iv)   *Notes Receivable Listing. As soon as available and in any event within forty-five (45) days after the end of each calendar quarter, a schedule of the name, address, and telephone number of all Account debtors which are indebted to Borrower as of the date of such request.*

(v)   *Other Information. On and after the Closing Date, furnish to Lender (a) any information which Lender may from time to time reasonable request concerning any covenant, provision, or condition of the Loan documents or any matter in connection with the Collateral or Borrower's businesses and operations, and (b) all evidence which lender may from time to time reasonable request as to the accuracy and validity of or compliance with all representations, warranties, and covenants made by Borrower in the Loan Documents, the satisfaction of all conditions contained therein, and all other matter pertaining thereto.  (p. 30)*

**(3) The Deed of Trust, Security Agreement, Financing Statement and Absolute**

**Assignment of Rents:**

15.   On or about June 27, 2008 TCB and Dallas Roadster executed a Deed of Trust, Security

Agreement, Financing Statement and Absolute Assignment of Rents. This document provided

additional assurances for the Bank, and diminished the prospect of loss to TCB under any

foreseeable circumstance.

---

### (4) Auditors Allowed by the Revolving Loan Security Agreement

16.      Further, at the time TCB filed its Emergency Application for Appointment of Receiver, TCB had taken advantage of the claimed contract right to put into place on the premises of DR a set of auditors who, on a daily basis at DR for nearly an entire year, apparently reviewed every financial transaction at DR. Thus, from late 2010, TCB had a front row seat to all financial transactions that could threaten the Bank's interests. It thus had the benefit of full transparency of DR's financial Conditions for many months, along with years of prior satisfactory financial performance. On any objective basis, TCB knew that Dallas Roadster posed no significant prospect of criminal action or violation which would threaten TCB's banking interest or cause it to be insecure a) under the contractual protections it had negotiated with DR and b) given the excessive collateral DR had provided.

### (5) Loan Modification, Renewal, and Extension Agreement

17.      Effective March 15, 2011, though executed two days later on March 17, 2011, Dallas Roadster and TCB entered into and executed a Loan Modification, Renewal, and Extension Agreement for the $4,000,000.00 Promissory Note. This document reiterated certain safety provisions that TCB had previously implemented in regards to DR.  However, it also altered certain safety provisions. Further, it deleted 7.3(a) in its entirety and replaced it with "(a) Minimum Tangible Net Worth. Borrower's Tangible Net Worth shall not be less than $2,600,000.00. The Minimum Tangible Net Worth shall be measured on a quarterly basis as of the last day of each calendar quarter." TCB evidently wanted to tighten its control over DR's performance provision.  In effect, given the level of control secured by TCB, TCB had gained capacity to micro-manage DR.

BKR409

18.     In an apparently related move, TCB also amended Exhibit B in the Certificate of

Compliance, to reflect the reduced Tangible Net Worth which was required as well as a

reduction in the Debt Service Coverage Ratio ("DSCR"). The covenant provided:

> (i) *Distributions not greater than 40% of the Net Income for any trailing 12 month
> period ending December 31, 2007, and after*
> (ii) *Tangible Net Worth of not less than $2,600,000.00*
> (iii) *Debt Service Coverage Ratio of not less than 1.25 to 1.0.*

These reductions are not indicative of a lender who is feeling insecure.

19.     Sections (iii) and (iv) of Exhibit C[3] was deleted and replaced with:

> (iii) Quarterly Financials of Borrower; Certificate of Compliance. *As soon as
> available and in any event within forty-five (45) days after the end of each quarter
> calendar, (a) compiled (by a certified public accountant acceptable to Lender)
> quarterly financial statements showing the financial positions and results of
> operations of Borrower as of, and for the quarter ended on, such last day,
> together with the certificate of an Authorized Officer of Borrower that ll such
> financial statements present fairly the financial position of Borrower as of the last
> day of such fiscal quarter then ended in conformity with GAAP, or other method
> of accounting acceptable to Bank. Each such financial statement shall contain at
> least a balance sheet of Borrower as of the end of such fiscal year and statements
> of income, and (b) a certificate of Compliance, duly executed by Borrower,
> certifying that Borrower is in full compliance with each of the covenants set forth
> herein and that there is no Event of default and no Potential Event of Default has
> occurred.*

> (iv) Account Receivable Listing and Aging. *As soon as available and in any event
> within thirty (30) days after the end of each calendar month, a schedule of the
> name, address, and telephone number of all Account Debtors which are indebted
> to Borrower as of the date of such request and an account receivable aging for
> such Account debtors in such form and detail as Lender shall require, both
> certified by an officer of Borrower.*

20.     Section (v) was also added to Exhibit C[4]:

> (v) *Inventory Report. As soon as available, and in any event within thirty (30)
> days after the end of each calendar month, an inventory report, in such form and*

---

[3] Of the Revolving Loan Security Agreement
[4] Of the Revolving Loan Security Agreement

BKR410

*detail as the Lender shall reasonably require, certified by the chief financial officer of the Borrower. (p.6)*

21.     These modifications, whether taken individually or as a whole, demonstrate that TCB was not a lender with a feeling of insecurity regarding DR's financial performance and its ability to service the loan.  And they demonstrate that TCB had more than adequate protections of it's interests.  TCB was more than adequately financially and legally secured from any serious consequence of any potential DR default.

**(6) Dallas Roadster Financial Overview**

22.     At the time that TCB allegedly felt insecure on November 16, 2011 in regards to the DR loan(s), DR had provided TCB approximately $12,372,958.48 in collateral. At that time, the total balance owed by DR to TCB was $5,410,490.00, $1,620,000.00 of which was comprised of DR's real estate debt. In fact, the latest TCB appraisal of real estate collateral values prior to November 16, 2011 reflected a great surplus in value: a) 404 Central Expressway = $1,190,000.00; b) 825 K Ave. = $870,000.00; c)  905 K Ave. = $1,130,000.00; and d) 1102 10th St. = $415,000.00, bringing the total real estate collateral as evaluated by TCB to $3,605,000.00. That appraised value was $2 million more than TCB had loaned against the real estate.  Thus, TCB was well secured in both its commercial and real estate loans to DR, with a ratio of 2.287 of collateral to debt.

**(7) DR's Average Monthly Vehicle Sales Generated Profits to TCB**

23.     TCB financed DR vehicles on a revolving floor plan, with a debt ceiling set by the $4 million loan. On average, prior to TCB's securing a receivership over DR, DR was selling more than 100 vehicles per month. As these were sold, DR routinely promptly paid TCB in full for any

BKR411

amount that TCB had financed against the vehicle sold. Although the total varied from month to

month, 2011 monthly vehicle sales income was as follows:

a) January, $1,644,179.80;

b) February, $1,256,663.00;

c) March, $1,608,709.50;

d) April, $1,933,827.50;

e) May, $1,730,693.00;

f) June, $1,442,493.20;

g) July, $1,535,489.60;

h) August, $2,107,123.00;

i) September, $1,295,184.50;

j) October, $1,706,585.00; and

k) November, $109,900.00 (the latter being a partial month due to the November 16,

2011 receivership TCB secured).

TCB made substantial commercial profits in these transactions, suffering no serious issues with

the vehicle payoffs.  TCB was well secured regarding its vehicles which were variously valued at

$4.1 million, wholesale, approximately $400,000 more than the November 16, 2011 revolving

floor plan of $3.7 million. In fact, through the years TCB had made more than $1,000,000 from

the DR relationship.

BKR412

### (8) TCB Had Immediate Access to DR's Funds

24.    TCB's security interest in TCB Money Market Account (121300493[5]) further protected

TCB. Those account funds came from an additional $500 per vehicle sale TCB required,

totaling approximately $286,100 on November 16, 2011. TCB also then had a TCB operating

fund account of approximately $211,388 and CD's worth $341,607.74. The total of $839,096.39

was available to TCB on November 16, 2011.

### (9) Average Monthly Payments DR Made to TCB

25.    For several months prior to the declaration of insecurity by TCB, DR had been paying

TCB faithfully on more than an average of $1.5 million dollars in vehicle loans. DR was selling

an average of more than 100 vehicles a month, and was well respected in the local automotive

and financial markets. DR was a stellar TCB customer, as the financial data set forth hereafter

reflects:

(i) January 2011

| | |
|---|---|
| Total Monthly Fixed Payments to TCB | $ 37,339.66[6] |
| Cars Paid Off on Floor Plan | $1,644,179.80 |
| **Remaining DR Accounts Balance** | **$ 455,385.00** |

(ii) February 2011

| | |
|---|---|
| Total Monthly Fixed Payments to TCB | $ 36,775.57 |
| Cars Paid Off on Floor Plan | $1,256,663.00 |
| **Remaining DR Accounts Balance** | **$ 435,969.00** |

(iii) March 2011

| | |
|---|---|
| Total Monthly Fixed Payments to TCB | $ 36,262.38 |
| Cars Paid Off on Floor Plan | $1,608,709.50 |
| **Remaining DR Accounts Balance** | **$ 977,021.00** |

---

[5] November 15, 2011, re: Notice of Acceleration under $4,000,000.00 Revolving Line of Credit from TCB (p.3)
Listed amount of $286,100.65 in Account Number 1213004793.
[6] That amount reflected approximately $21,000 paid on real estate, with balance being interest on the revolving
vehicle floor plan.

(iv) April 2011
| | | |
|---|---|---|
| Total Monthly Fixed Payments to TCB | $ | 36,487.95 |
| Cars Paid Off on Floor Plan | $1,933,827.50 | |
| **Remaining DR Accounts Balance** | $ | **539,844.04** |

(v) May 2011
| | | |
|---|---|---|
| Total Monthly Fixed Payments to TCB | $ | 36,389.68 |
| Cars Paid Off on Floor Plan | $1,730,693.00 | |
| **Remaining DR Accounts Balance** | $ | **594,464.47** |

(vi) June 2011
| | | |
|---|---|---|
| Total Monthly Fixed Payments to TCB | $ | 36,674.31 |
| Cars Paid Off on Floor Plan | $1,442,493.20 | |
| **Remaining DR Accounts Balance** | $ | **626,180.70** |

(vii) July 2011
| | | |
|---|---|---|
| Total Monthly Fixed Payments to TCB | $ | 36,822.62 |
| Cars Paid Off on Floor Plan | $1,535,489.60 | |
| **Remaining DR Accounts Balance** | $ | **713,892.50** |

(viii) August 2011
| | | |
|---|---|---|
| Total Monthly Fixed Payments to TCB | $ | 38,578.08 |
| Cars Paid Off on Floor Plan | $2,107,123.00 | |
| **Remaining DR Accounts Balance** | $ | **690,127.07** |

(ix) September 2011
| | | |
|---|---|---|
| Total Monthly Fixed Payments to TCB | $ | 40,619.91 |
| Cars Paid Off on Floor Plan | $1,295,184.50 | |
| **Remaining DR Accounts Balance** | $ | **682,400.54** |

(x) October 2011
| | | |
|---|---|---|
| Total Monthly Fixed Payments to TCB | $ | 34,719.33 |
| Cars Paid Off on Floor Plan | $1,706,585.00 | |
| **Remaining DR Accounts Balance** | $ | **753,208.65** |

(xi) November 2011
| | | |
|---|---|---|
| Total Monthly Fixed Payments to TCB | $ | 39,573.27 |
| Cars Paid Off on Floor Plan | $ | 109,900.00 |
| **Remaining DR Accounts Balance** | $ | **839,096.39** |

**(10) Summary of DR's Financial Condition in comparison to TCB's Risk on**

**November 16, 2011**

---

26.      In sum, TCB held more than $2,000,000 in real estate collateral above what was owed (approximately $3,605,000 vs. $1,600,000); held more than $2,640,000 in wholesale motor vehicle inventory/collateral and DR customer notes receivable (approximately $6,341,000 vs. $3,700,000).  Given the average of approximately $37,000 in fixed payments due TCB every month, compared to the $839,096.39 in cash collateral held by TCB, TCB had the equivalent of more than 22 months prepayment on DR's fixed note obligations. Further, it held almost $7 million more than what was owed by DR ($12,372,958.48 total collateral vs. $5,410,490 in debts).  In addition, it held $4 million in "key man" life insurance, combined, on Ben K. and Ben A. In addition, TCB had the personal guarantees of both Ben A. and Ben K.  TCB was very well secured financially.

**(11) TCB's Unfounded Declaration of Default**

27.      Despite DR's solid financial foundation and TCB's overwhelming financial security, on or about November 16, 2011 TCB amazingly declared itself "insecure." It then declared a loan default and sought an immediate receivership from a Dallas state district court without notice to Ben A., Ben K., or DR.  To secure the receivership, TCB fabricated the basis for the appointment of a receiver, deceived the Court by misrepresenting key facts and, perhaps more importantly, deliberately refused to disclose to the Court contextual facts reflecting how TCB secured position. What follows is a declaration on information and belief regarding events that may have been used to justify the declaration, despite TCB's self-evident misleading representations to the Court.

**E.      Texas Capital Bank's Contact with the DEA**

---

28.     On information and belief, TCB decided to betray Ben A., Ben K., and DR after a visit by

the Drug Enforcement Agency ("DEA"). As a result of that contact, TCB's essentially white

upper-management made an "us" or "them" decision, distancing TCB from DR in every way

possible, even suggesting that DR activity was suspicious. That began the series of events

whereby TCB deliberately tried to frame Ben A., Ben K. and DR for crimes they had not

committed, and worked to bait them into committing crimes.  The triggering event appears to

have been a September 9, 2010, law enforcement service of a federal grand jury subpoena on

TCB. That subpoena was essentially given to TCB Senior Vice-President Charlotte Lowe to be

the designated official TCB responding party. Lowe, an officer with general capacity to bind

TCB for all legal liability sought here, had TCB authority to hire and fire and to make TCB

senior management decisions for the Bank.  More specifically, she was directly authorized by

even higher TCB management to speak for TCB in this and all matters related to the DEA

investigation and DR.  She was also authorized to commit TCB in its actions against Ben A., Ben

K., and DR.

29.     In effect, that federal subpoena triggered a Pavlovian reaction by TCB to avoid being

implicated in a potential federal money laundering investigation.  Thus, that Pavlovian reaction

encouraged and allowed the rise of a generally latent TCB institutional bias against non-white

minorities such as Ben A. and Ben K., both of middle-eastern lineage. TCB senior officials

would not have done the same to its white customers similarly situated.

30.     On September 9, 2010 Senior Vice President Lowe falsely told DEA agents that Ben A.

was the president of DR. Thus, she set Ben A. up for targeting by the DEA. She also identified a

number of allegedly suspicious activities conducted within the DR accounts, including structured

BKR416

deposits of currency. Lowe told agents that it was bank policy to note these suspicious activities as it identified them and to properly report them. Lowe also informed agents that TCB had told Amini both in person as well as by letter about the federal reporting requirements that he and his company were responsible for with sales involving currency in amounts greater than $10,000. (Source Application for a search warrant signed by Judge Mazzant – filed 11/15/11)

31.     On or about October 27, 2011, a DEA agent spoke with Lowe from TCB regarding a just-completed nearly year long audit of DR as part of the floor plan loan. TCB reported DR to be a cash intensive business with numerous purchases of vehicles for currency. The auditors also reported viewing IRS 8300 Forms placed within the sales folders for vehicles sold by DR. The auditors could not determine whether the 8300 Forms had been filed with the IRS. (Source Application for a search warrant signed by Judge Mazzant – filed 11/15/11).

32.     On or about November 9, 2011, a Federal Grand Jury in the Eastern District of Texas returned SEALED indictments against Bahman Hafezamini ("Ben A.") and Jose Jimenez for alleged money laundering in connection with their operation of Dallas Roadster, apparently based on deliberately false and/or misleading and incomplete information provided by TCB.

33.     On or about November 16, 2011 TCB filed Plaintiff's Original Petition and Emergency Application for Appointment of Receiver ("Receivership Application"), relying on that sealed indictment. Attached to the Original Petition was Paul Noonan's affidavit, ("Noonan Affidavit"), notarized on November 15, 2011. Both the Receivership Application and the Noonan Affidavit might appear accurate until compared with the timing of other indisputably relevant events. Specifically, the Receivership and Noonan's Affidavit assert that:

---

Ben Amini's Original Answer and Counterclaim                                        Page 21

*On or about November 9, 2011, a federal grand jury in the Eastern District of Texas returned indictments against Defendant [Amini] and Jose Ivan Jimenez ("Jimenez"), who is, on the Bank's information and belief, an employee of Dallas Roadster, for alleged money laundering in connection with their operation of Dallas Roadster.*

*The federal indictments of [Amini] and Jimenez in connection with the operation of Dallas Roadster and the alleged conduct supporting such indictments constitute a default of the parties' respective obligations under the Loan Documents. Such indictments and the alleged conduct on which the indictments are based adversely affect the Bank's security interest in the collateral and jeopardize the collateral itself. For example, a halt in the operations of Dallas Roadster due to the indictments would render it and its principals unable to maintain or liquidate the collateral in an orderly manner. The indictments could also subject the collateral to forfeiture or other governmental action in which the Bank's interest would need to be protected. In pertinent part, the Loan Documents specify that the following events or conditions shall be considered events of default under the respective documents, including the Note:*

a.  *Pursuant to Section 9.1(n) of the Loan Agreement, "Lender, in good faith, shall deem itself insecure,"*

b.  *Pursuant to Section 9.1(o) of the Loan Agreement, "Borrower or any Guarantor suffers a material adverse change in its business or financial condition;" and*

c.  *Pursuant to Section 5(e) of the Pledge Agreement, "any...deterioration or impairment of the Collateral or any part thereof."*
    *The indictments of [Amini] and Jimenez to the operations of Dallas Roadster and materially affect both its and the Guarantors' business and financial condition. As a result, the Bank's collateral for the Loan has been impaired the Bank deems itself insecure.*

(par. 15, 16 & 19 Receivership)

34.    TCB had secured, apparently in violation of law, access to federally sealed indictments,

with the sealing being reflected in Eastern District of Texas docket text and filings ("Sealed

Indictment"). Further, said Court's policy not to unseal indictments until the person is before the

Court on November 16, 2011 is reflected by Court's docket entry. Further, Amini and Jimenez

did not have their initial appearance until 2:29 pm and 2:40 pm, respectively, on November16,

---

BKR418

2011, nearly five (5) hours <u>after</u> TCB sought and filed the receivership application, and a full day

<u>after</u> TCB senior vice-president Paul Noonan's Affidavit claimed knowledge of the sealed

indictment under oath.

35.    The Receivership Application and Noonan's Affidavit filed at 9:30 a.m. on November

16, 2011 assert that:

> *The Bank has been notified that the federal authorities have, pursuant to a search*
> *warrant, seized records and other items utilized by Dallas Roadster in the*
> *operation of its business. Such seizure, along with the indictments referenced*
> *above, compromise the Bank's security interest in the Loan's collateral, making*
> *irreparable harm to the Bank's interest imminent.*

(par. 26 of Receivership and par. 16 of Noonan's Affidavit)

36.    This assertion is also quite peculiar since documents filed with the Court show that the

Warrants against DR were not executed until 9:30 am on November 16, 2011. As the

Receivership Application was filed six (6) minutes <u>later</u>, TCB apparently absurdly wanted the

State District Court – who was not informed of the key issues here – to believe that the federal

indictments and/or warrants created TCB "insecurity" within some 6 minutes time. Or perhaps

TCB asserts that those federally- related documents caused such concern that in a mere 6

minutes TCB was able to put together hundreds of pages of documents supporting the 13 pages

of Receivership Application and the 10 page Noonan Affidavit.  Or perhaps TCB claims that it

became insecure when it learned of a federal search and seizure that hadn't happened yet.

Whatever the curious explanation TCB offers, it cannot explain Noonan's Affidavit, which

contains those identical allegations and which the notary marks as having been done the day

<u>before</u> the search warrant was executed. In short, TCB's senior management targeted Americans

of Middle Eastern origin (and specifically Ben A.) and their business for disparate treatment.

---

Ben Amini's Original Answer and Counterclaim                                         Page 23

TCB wrongly, on knowingly false oaths, obtained a Receivership over DR to crush the business into submission in a way they would not have done with its white bank customers. TCB, in the absence of good faith, declared itself insure, and filed false statements to secure a crushing receivership order against DR, knowing that it would also crush Ben A. and Ben K. personally.

**F.    TCB Did Not Send Notice of Default as Alleged in the Receivership Application for the $4,000,000.00 Note**

37.    In its Receivership application, TCB affirmatively informed the Court that:

> *Dallas Roadster has failed to cure the above-entitled defaults despite notice of default, notice of acceleration and demand by the Bank. The Bank hereby sues Dallas Roadster on the Note. Based on Dallas Roadster's default and breach of its duties, the Bank is entitled to a judgment from and against Dallas Roadster for that portion of the amount due and owing on the Note.*

(par. 20 Receiver)

That statement is misleading. First TCB sent three letters: (1) the June 17, 2011 letter re: Notice of Potential Default under $4,000,000.00 Revolving Line of Credit from TCB, (2) the October 26, 2011 letter re: Notice of Default under $4,000,000.00 Revolving Line of Credit from TCB, and (3) the November 15, 2011 letter re: Notice of Acceleration under $4,000,000.00 Revolving Line of Credit from TCB.

38.    The June 17, 2011 letter re: Notice of Potential Default under $4,000,000.00 Revolving Line of Credit from TCB was based on TCB's misinterpretation of the inventory list that Dallas Roadster had sent it. Thus, after receiving this June letter Ben Amini went to TCB and Mr. Noonan, explaining the inventory list. That dispelled any notion of potential default that TCB might have had, after misinterpretation. There was no notice of default given.

---

Ben Amini's Original Answer and Counterclaim                                                  Page 24

39.     The October 26, 2011 letter re: Notice of Default under $4,000,000.00 Revolving Line of

Credit from TCB again inaccurately portrayed Dallas Roadster's financial situation. The basis

for this was an October 24, 2011 letter received by TCB from Automotive Financial Corporation

("AFC"), wherein AFC allegedly declared that it "has or expects to acquire a purchase money

security interest in…all of [Dallas Roadster, Limited's] assets and properties." Ben A. again

visited Noonan, despite having a meeting with him on Friday, October 21, 2011, wherein he

explained that Dallas Roadster had not and would not activate a line of credit with another lender

until and unless TCB authorized as much in writing. That again dispelled any TCB concerns.

40.     The November 15, 2011 letter re: Notice of Acceleration under the $4,000,000.00

Revolving Line of Credit from TCB verifies that "[Dallas Roadster] advised Noonan that no such

financing facility with Automotive Financial Corporation was consummated." The letter then

goes on to point to receipt of a letter from AFC, the language of which appears to be the same,

just slightly more expanded upon, as the letter TCB cited in the October 26, 2011 letter. TCB

does not clarify when this letter was received or whether it was the same letter that Ben A. had

previously discussed and explained to Noonan. Whether the same or not, the language is the

same and thus had been explained by Ben A., apparently to TCB's satisfaction.  Furthermore,

Amini did not receive this letter until after the Receivership was granted on November 16, 2011.

**G.     TCB Contrary Declaration Prior to Grand Jury Proceedings**

41.     On or about January 15, 2013 TCB's representative stated that TCB had been trying for

several months to find something wrong at DR, but could not.  Thereafter, on information and

belief, TCB, contrary to its representative's declaration, presented the federal investigative

---

Ben Amini's Original Answer and Counterclaim                                      Page 25

authorities with false and/or misleading and incomplete information against Ben A., Ben K., and

DR.


IV.
CAUSES OF ACTION

**A.      Adoption of Causes of Action Alleged by Dallas Roadster, LTD. (and IEDA**

**Enterprises, Inc.)**

42.     Defendant/Counter-Plaintiff re-alleges and incorporates paragraphs 1-41 as if fully

contained here, and any facts set for the hereinafter.

43.     To the extent that TCB's actions were directed by TCB with deliberate intention to harm

a small business like DR, TCB's intention and deliberate action was necessarily focused on not

only crushing the DR structure, but also the principals within, including Ben A. and Ben K.

More specifically, as effectively half owner of the business, the intention must have been to hurt

Ben A. individually. In fact, it would be impossible to harm DR substantially without harming

Ben A. significantly. Thus, to the extent alleged by DR, Ben A. incorporates the allegations of

DR as his own.

**B.      Malicious Prosecution of Civil and/or Criminal Proceedings**

44.     Defendant/Counter-Plaintiff re-alleges and incorporates paragraphs 1-41 as if fully

contained here, and any facts set for the hereinafter.

---

Ben Amini's Original Answer and Counterclaim                                    Page 26

BKR422

45.     TCB caused to be filed a state court receivership action at a time when it knew it had no reasonable, good faith basis to do so, as reflected in the amount and variety of financial security set forth above.

46.     TCB caused to be filed federal criminal charges against Ben A. at a time when it knew that there was no good faith basis to do so.

47.     Both the civil and criminal proceedings were commenced against Ben A. (the civil being commenced at a time that it was effectively against Ben A.), caused by TCB or through TCB's aid or cooperation.

48.     These actions were undertaken either with such intent and deliberation, or with such recklessness, that malice in TCB's action is inferable form the facts.

49.     There was an absence of probable cause for the institution of the respective proceedings.

50.     The proceedings have terminated (criminal) or reasonably will terminate (civil) in Ben A.'s favor by the time these proceedings are completed.

51      Ben A. suffered damages conforming to legal standards.

**C.     Abuse of Process**

52.     Defendant/Counter-Plaintiff re-alleges and incorporates paragraphs 1-41 as if fully contained here, and any facts set for the hereinafter.

53.     As reflected above, TCB caused to be filed based on false statements and an incomplete fact presentation to the State District Judge a set of allegations which, had the basis therefor been fully made known to the Court, the Court would have required a full hearing with notice, and thereafter would not likely have ordered a receivership.

---

BKR423

54.     However, without notice and with improper purpose, TCB made illegal, improper, or perverted us of process that was not warranted by the process, namely to shut down DR, interfering with its business in such a way as to cause its business to vanish, its inventory to be sold for pennies on the dollar, and TCB allowed to crush its bank customer.

55.     TCB had an ulterior motive to misuse the process, namely to divert attention from its own concerns over possible money laundering charges, and to distract federal investigators by pointing the unwarranted finger at Ben A., Ben K., and DR.

56.     DR, and therefore Ben A. and Ben K. suffered great damages to their business interests in DR, their reputations, and related interests.

**D.     Intentional Infliction of Emotional Distress**

57.     Defendant/Counter-Plaintiff re-alleges and incorporates paragraphs 1-41 as if fully contained here, and any facts set for the hereinafter.

58.     TCB acted intentionally or recklessly, causing severe distress, with extreme and outrageous conduct proximately causing Ben A.'s distress to himself and his family, with actual damages cognizable in law.  No alternative cause of action will provide such a remedy.

**E.     Tortious Interference with Existing Contracts and Prospective Relations**

59.     Defendant/Counter-Plaintiff re-alleges and incorporates paragraphs 1-41 as if fully contained here, and any facts set for the hereinafter.

60.     As reflected in the facts, Ben A. and DR were successful in the automotive business. They had developed solid and continuing relationship which benefitted them and the Bank.  The Bank was aware of these relationships, and prized the money made by DR.  When DR tried to

---

Ben Amini's Original Answer and Counterclaim                                                      Page 28

leave the Bank or develop alternative relationships, the Bank took steps to discourage it. In effect, DR was made a captive customer.

61.     When TCB made deliberate efforts to harm DR, it did so knowing that Ben A. was a key part of this small business, and effectively half owner.  In effect, TCB knew that any action to harm DR would directly harm Ben A., and his business relationships both outside and inside the DR structure.

62.     Ben A. possessed valid contracts with his partner in DR, Ben K., another financing bank, and many past and repeat customers.  TCB willfully and intentionally interfered with these contracts, proximately causing injury and actual damages.

63.     Ben A., in reasonable probability would have entered and continued in a business relationship with a third party, Ben A., either with or for DR, could have obtained alternate financing and business structures that would have avoided the bias and prejudice that led to Ben A. being singled out for disparate treatment. Defendant intentionally interfered with such potential relationships. TCB's conduct was independently tortious or unlawful, proximately causing injury Ben A.

**F.     Fraud/Fraud in the Inducement/Deceptive Trade Practices Violation**

64.     Defendant/Counter-Plaintiff re-alleges and incorporates paragraphs 1-41 as if fully contained here, and any facts set for the hereinafter.

65.     Through artifice, scheme, and design, TCB set up Ben A. to take a fall for criminal charges which he had not committed. However, because TCB feared the consequences of the investigatory embarrassment and potential danger to its business relationships, TCB intentionally

---

Ben Amini's Original Answer and Counterclaim                                                  Page 29

assisted in the presentation and/or manufactured false or misleading, and incomplete information to deflect any attention from itself in a federal investigation.

66.    The actions of TCB resulted in essentially one or more acts of fraud to make something appear which true which was not, and to harm Ben A. in the process.  This kind of fraud is both more complex and more insidious than mere single misrepresentations in other fraud cases. However, there were false and misleading statements in the assurances that TCB gave Ben A. and DR in the course of gathering false information to present a false picture of Ben A. and DR to federal investigators. For example, TCB misrepresented the reason for auditors to be placed in DR to review every account for several months. TCB misrepresented the resulting evidence. TCB misrepresented the basis for seeking a modification of the lending terms during the several month audit proceeding. And TCB was aware of and participated in sting operations against Ben A. and Ben K., as well as DR.

67.    These deceptive acts against a customer of the bank amounted to fraud, fraud in the inducement, and violation of the Texas Deceptive Trade Practices Act, resulting in proximate or the producing cause of actual damages.

**G.    Promissory Estoppel**

68.    Defendant/Counter-Plaintiff re-alleges and incorporates paragraphs 1-41 and the facts set forth to support the fraud cause of action in the immediately proceeding section, as if fully contained here, and any facts set for the hereinafter.

69.    TCB made one or more promises which are or were not otherwise a part of a valid contract.  Those promises disarmed Ben A. from being able to protect himself against the fraud and efforts against him by TCB.  In effect, TCB made false and misleading promises that matters

Ben Amini's Original Answer and Counterclaim                                          Page 30

were proceeding well, that the auditors were in the business on a relatively routine basis or for

reasonable causes, that their relationship with the Bank was solid and there was no reason to seek

alternative financing, and related representations.  Those representations/promises were relied

upon to Ben A.'s detriment, and his damages.

### H.    Wrongful Receivership

70.    Defendant/Counter-Plaintiff re-alleges and incorporates paragraphs 1-41 as if fully

contained here, and any facts set forth hereinafter.

71.    The law of receivership is very restrictive: "A receivership is the most radical remedy

known to our jurisprudence; it discredits, cripples, and, in a majority of instances, puts an end to

any business or enterprise, and ... should never be applied where abuses may be corrected and

prevented by application of milder remedies." *Rex Refining Co. v. Morris,* 72 S.W.2d 687, 692

(Tex.Civ.App.¬Dallas 1934, no writ). Because the appointment of a receiver is disfavored in

law, receivership should be invoked cautiously and sparingly. A receiver should not be appointed

unless a clear showing of necessity is made and, ordinarily, unless there exists an actual danger

of the property being lost, removed or materially injured. *See* TEX. CIV. PRAC. & REM. CODE

§ 64.001(b). A receiver should not be appointed where a less drastic remedy is available to

protect the property.

72.    Where a receivership is set aside on the ground that is was obtained on the basis of false

of improper allegations, or without notice or hearing, the applicant may be held liable for loss or

injury resulting to the defendant from the wrongful appointment and the consequent possession

of the defendant's property by the receiver.

BKR427

73.     As set forth above, TCB had no lawful basis for the appointment of a receiver under the facts alleged.  It is therefore liable for all damages resulting therefrom, particularly in light of Defendant/Counter-Plaintiff's substantial interest in DR, and TCB's intention to harm Ben A.

## V.
## Equal Credit Opportunity Act

74.     Defendant/Counter-Plaintiff re-allege and incorporate paragraphs 1-42 as if fully contained here, and any facts set for the hereinafter.

75.     Under the Equal Credit Opportunity Act ("ECOA"), a lender may not discriminate against a borrower or decide the terms of  credit based on the borrower's race, color, or national origin "with respect to any aspect of a credit transaction," 15 U.S.C. § 1691. This applies both to the granting or extension of credit.

76.     Under the facts asserted in this Counterclaim, it is apparent that TCB discriminated against Ben A., as a minority owner of a borrower and a guarantor. The same holds true of Ben K.  -Consciously, and with intent, TCB did not treat DR in the same manner as they would have treated a non-minority owned commercial borrower, setting Ben A. (and Ben K.) up to take any fall that might come from a federal investigation, assisting in gathering purported evidence that the evidence gatherers did not believe showed wrong doing, Despite having no reasonable, good faith basis, TCB declared the minority-borrowers in default merely because of suspicion based on their Middle-Eastern ethnicity.

77.     TCB's essentially white upper management decided deflect any potential criticism from

---

Ben Amini's Original Answer and Counterclaim                                                      Page 32

TCB by leaving Ben A. and Ben K. to fend for themselves as TCB began to try to frame them for

crimes that they had not committed.  In essence, TCB treated Defendant/Counter-Plaintiff Ben

A. differently than it would have treated a non-minority borrower in a similar circumstance.

This is particularly true given the excellent credit performance and collateral Defendant/Counter-

Plaintiff had with TCB.

### VI.
### Other Causes Reserved

78.     Counter-Plaintiff reserves the right, after discovery, to further specify and support related

claims against TCB.

### VII.
### Attorneys' Fees

79.     Defendants/Counter-Plaintiffs seek attorney's fees as allowed by law, including but not

limited to, recovery under Texas Civil Practice & Remedies Code § 38.001, et seq., 15 U.S.C. §

1691, et seq., Texas Deceptive Trade Practices Act.

### Prayer

Therefore, Defendant/Counter-Plaintiff Ben Amini, request that this Court find that

Plaintiff take nothing, and that Counter-Claimant recover actual and exemplary damages,

attorney's fees and costs, pre- and post-judgment interest, and such other and further relief to

which he may show himself justly entitled.

---

BKR429

Respectfully submitted,

_____/s/_____

Blake Bailey
State Bar No. 01514500
903-593-7660
Bailey Law Firm
522 S Broadway
Tyler, Texas  75702

---

BKR430

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded to all parties via the electronic delivery system of the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division.

So certified on this 31st day of July, 2013.

/s/
_____
Blake Bailey

Ken Stohner
Jackson Walker, LLP
901 Main Street, Ste. 6000
Dallas, TX  75202

J. Bennett White
J. Bennett White, P.C.
P.O. Box 6250
Tyler, TX 75711

John M. Vardeman
UST Office
110 N. College St., Suite 300
Tyler, TX 75702

T. Chase Garrett
Albin Yates Balius Roach
5601 Granite Parkway, Suite 400
Plano, TX 75024

Roger D. Sanders
Michael Young
Sanders, O'Hanlon, Motley, & Young, PLLC
111 S. Travis St.
Sherman, Texas 75090

---

Ben Amini's Original Answer and Counterclaim                                    Page 35