IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TEXAS CAPITAL BANK, N.A., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 4:13-cv-00625 |
| | § | |
| DALLAS ROADSTER, LTD., IEDA | § | |
| ENTERPRISE, INC., BAHMAN KHOBAHY, AND | § | |
| BAHMAN HAFEZAMINI, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF TEXAS CAPITAL BANK, N.A.'S
## FIRST AMENDED COMPLAINT

Plaintiff Texas Capital Bank, N.A. ("TCB") files this First Amended Complaint against Defendants Dallas Roadster, Ltd., IEDA Enterprise, Inc., Bahman Khobahy, and Bahman Hafezamini ("Defendants"):

### I.     PARTIES

1.     Texas Capital Bank, N.A. ("TCB") is a national banking association doing business in Dallas, Plano, Richardson, and other cities throughout Texas.

2.     Dallas Roadster, Limited ("DR") is a Texas limited partnership selling used cars in Richardson, Texas.

3.     IEDA Enterprise, Inc. ("IEDA") is a Texas corporation which serves as DR's general partner, owns 1% of DR, and is a guarantor of DR's indebtedness to TCB.

4.     Bahman Hafezamini ("Hafezamini") is an individual who resides in Collin County, Texas, who allegedly owns a 49.5% interest in DR and a 50% interest in IEDA, is a principal and "key man" in DR's operations, and is a guarantor of DR's indebtedness to TCB.

5.     Bahman Khobahy ("Khobahy") is an individual who resides in Collin County, Texas, who allegedly owns a 49.5% interest in DR and a 50% interest in IEDA, and is a guarantor of DR's indebtedness to TCB.

6.     All parties have appeared.

## II.     JURISDICTION, VENUE, AND PROCEDURAL POSTURE

7.     On November 16, 2011, as a result of events of which TCB was then aware – including Hafezamini's November 9, 2011 federal indictment for drug money laundering in connection with DR's used car business – TCB sought and obtained a receivership over DR's assets by filing Plaintiff's Original Petition and Emergency Application for Appointment of a Receiver in an action styled *Texas Capital Bank, N.A. v. Dallas Roadster, Ltd., IEDA Enterprise, Inc., Bahman Khobahy, and Bahman Hafezamini*, No. DC-11-14521, 192nd Judicial District Court, Dallas County, Texas.[1]

8.     DR never moved to vacate the receivership order or challenged it by interlocutory appeal within the 20 days allowed for taking such actions under Texas law.

9.     On December 12, 2011, DR and IEDA filed voluntary chapter 11 bankruptcy cases.   Shortly after DR and IEDA filed their bankruptcy petitions, the receivership was terminated by an agreed turnover order.[2]   Bankruptcy Judge Brenda Rhoades found in the Turnover Order that "[a]s a result of the Indictment and certain defaults triggered in the loan

---

[1] *See* Dkt. No. 10, Exhibits 1-D & 1-F, which are incorporated herein by reference.
[2] Dkt. No. 25 in Case No. 11-43725 before the United States Bankruptcy Court for the Eastern District of Texas ("Turnover Order").

documents, [TCB] sought and obtained an *ex parte* order approving a receiver."[3]  As a condition to returning the control of DR's assets to DR, the Bankruptcy Court required that "Hafezamini shall resign from any office or position he may hold in the Debtors if he has not already done so . . . [and that] Hafezamini shall not enter the premises of the Debtors unless otherwise authorized by the Court."[4]

10.     This case was removed to Bankruptcy Court and became Adversary No. 13-04033.

11.     This case is pending in this Court through an order withdrawing an order of reference entered by the United States District Court, Eastern District of Texas, Sherman Division.  Jurisdiction is proper under 28 U.S.C. § 1334 and 28 U.S.C. § 1367.  Venue is proper under 28 U.S.C. § 1409 and 28 U.S.C. § 1391(b).

### III.     FACTS

#### A.     Loan Documents and Rights to Attorneys' Fees, Costs, and Expenses

12.     On or about May 10, 2008, DR executed a Promissory Note payable to TCB in the amount of $4,000,000.00, the proceeds of which were used to finance DR's purchases of used cars for resale and DR's general business needs (the "Vehicle Note").[5]  TCB is the present owner and holder of the Vehicle Note.  The Vehicle Note, as amended, had a Maturity Date of December 15, 2011.

13.     Section 6 of the Vehicle Note provides that, "after the occurrence of an Event of Default hereunder, [if TCB] consults an attorney regarding the enforcement of any of its rights under this Note or if this Note is placed in the hands of an attorney for collection or if suit be

---

[3] Turnover Order at 6.

[4] Turnover Order at 9.

[5] A true and correct copy of the Vehicle Note is attached as Exhibit A and incorporated by reference.

brought to enforce this Note, [DR] promises to pay all costs thereof, including reasonable attorneys' fees."

14.     Concurrently with the Vehicle Note, TCB, DR (by IEDA), Khobahy, and Hafezamini executed a Loan and Security Agreement (the "May 2008 Loan Agreement") on or about May 10, 2008, which provided additional terms and conditions for DR's indebtedness to TCB, and through which DR granted a security interest to TCB covering substantially all of its property.[6]  Section 7.1(h) of the May 2008 Loan Agreement requires DR:

> [P]romptly (and in any event within three (3) days after any invoice or other statement or notice) [to] pay all reasonable costs or expenses incurred by or on behalf of [TCB] (including attorneys' fees) in connection with (i) the negotiation, preparation, execution and delivery of the Loan Documents, and any and all consents, waivers or other documents or instruments relating thereto . . . (iii) the borrowings hereunder and other action reasonably required in the course of administration hereof . . . (iv) the defense or enforcement of the Loan Documents, and (v) the defense or enforcement of the Loan Documents and the amendment, restructuring or 'workout' of any of the Loan Documents.

15.     Further, in § 9.6 of the May 2008 Loan Agreement :

> [DR] promise[d] to indemnify [TCB], upon demand, from and against any and all liabilities, obligations, claims, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against [TCB] . . . (whether or not caused by any negligent act or omission of any kind by [TCB]) growing out of or resulting from the Loan Documents and the transactions and events at any time associated therewith (including without limitation the enforcement of the Loan Documents and the defense of [TCB]'s actions and inactions in connection with the Revolving Loan).

16.     On or about June 27, 2008, DR executed a Promissory Note payable to TCB in the amount of $2,067,945.00 to refinance debt associated with properties in Dallas and Plano where DR conducted its used car sales and other operations (the "Real Estate Note").[7]  TCB is

---

[6] A true and correct copy of the May 2008 Loan Agreement is attached as Exhibit B and incorporated by reference.

[7] A true and correct copy of the Real Estate Note is attached as Exhibit C and incorporated by reference.

the present owner and holder of the Real Estate Note.  The Real Estate Note had a Maturity Date of June 27, 2013.

17.     Section 7 of the Real Estate Note provides that, "after the occurrence of an Event of Default hereunder, [if TCB] consults an attorney regarding the enforcement of any of its rights under this Note or if this Note is placed in the hands of an attorney for collection or if suit be brought to enforce this Note, [DR] promises to pay all costs thereof, including reasonable attorneys' fees."

18.     TCB, DR (by IEDA), Khobahy, and Hafezamini executed a second Loan and Security Agreement on or about June 27, 2008 (the "June 2008 Loan Agreement," and together with the May 2008 Loan Agreement, the "Loan Agreements"), which provided additional terms and conditions for DR's indebtedness to TCB, and through which DR granted a security interest to TCB covering substantially all of its property.[8]  Section 9 of the June 2008 Loan Agreement requires DR to "pay all out-of-pocket expenses (including without limitation, the reasonable fees and expenses of counsel for [TCB]) in connection with the negotiation, preparation, execution, filing, recording, refiling, re-recording, administration, modification and supplement of the Loan Documents and the making, servicing and collection of the Loan."

19.     Certain property securing DR's indebtedness to TCB is more particularly described in a Deed of Trust, Security Agreement, Financing Statement, and Absolute Assignment of Rents ("Deed of Trust") executed by DR in favor of TCB on or about June 27, 2008.[9]  The Deed of Trust provides additional terms and conditions for DR's indebtedness to TCB.  Deed of Trust § 3.2(i) provides that:

---

[8] A true and correct copy of the June 2008 Loan Agreement is attached as Exhibit D and incorporated by reference.

[9] A true and correct copy of the Deed of Trust is attached as Exhibit E and incorporated by reference.

> Subject to any applicable limitations provided in the other Loan Documents, [DR] will pay all . . . reasonable attorneys' fees, and all other costs and expenses of every character incurred by [DR] or [TCB] in connection with the Indebtedness, either at the closing thereof or at any time during the term thereof . . . and will reimburse [TCB] for all such reasonable costs and expenses incurred by [TCB].

20.     IEDA, Khobahy, and Hafezamini each executed Unlimited Guaranty agreements (the "Guaranties") on or about May 10, 2008, under which they guaranteed "all indebtedness, obligations and liabilities of [DR] to [TCB] . . . of any kind and character, now existing or hereafter arising," including without limitation all amounts owed under the Vehicle Note and the Real Estate Note, "when due or declared to be due and at all times thereafter."[10]  *See* Guaranties, §§ 1-2.  In addition, IEDA, Khobahy, and Hafezamini agreed "[to] pay on demand by [TCB] all costs and expenses, including, without limitation, all reasonable attorneys' fees incurred by [TCB] in connection with the enforcement and/or collection of this Guaranty.   This covenant shall survive the payment of the Guaranteed Indebtedness."  Guaranties, § 18.

21.     TCB is the owner and holder of the Guaranties.  Each Guaranty was supported by valuable consideration.  *See* Guaranties, § 2.

22.     On or about March 15, 2011, DR executed a Pledge Agreement in favor of TCB, which granted additional security for DR's indebtedness to TCB and under which DR agreed "to indemnify and hold [TCB] harmless from and against any and all . . . costs and expenses (including attorneys' fees) incurred by [TCB] in respect [of the Pledge Agreement, the Indebtedness, or the Collateral]."[11]  Pledge Agreement § 3(g).

---

[10] True and correct copies of the Guaranties are attached as Exhibits F, G, and H and incorporated by reference.

[11] A true and correct copy of the Pledge Agreement is attached as Exhibit I and incorporated by reference.

23.   The Vehicle Note, the Real Estate Note, the May 2008 Loan Agreement, the June 2008 Loan Agreement, the Deed of Trust, the Guaranties, and the Pledge Agreement are each valid, enforceable contracts.

24.   TCB has performed its obligations and all conditions precedent have occurred under the Vehicle Note, the Real Estate Note, the May 2008 Loan Agreement, the June 2008 Loan Agreement, the Deed of Trust, the Guaranties, and the Pledge Agreement.

**B.   Contractual Rights of Acceleration and Enforcement Without Notice or Demand**

25.   Under the Loan Agreements, upon an Event of Default (as defined in either Loan Agreement), TCB is entitled, without notice, demand, or the satisfaction of any other conditions precedent, to accelerate all principal, interest, and other sums due from DR to TCB, and to immediately enforce payment of same, including without limitation by filing suit:

> a.   May 2008 Loan Agreement § 9.2(a), § 9.2(h) (Upon the occurrence of an Event of Default, TCB may "accelerate the entire outstanding principal balance together with all accrued but unpaid interest on the Indebtedness (specifically including the Revolving Note) and all other sums due and payable by [DR] to [TCB] without demand, presentment, notice of dishonor, notice of intent to demand or accelerate payment, diligence in collection, grace, notice and protest or legal process of any kind, all of which [DR] hereby expressly waives . . . [and] . . . immediately, without any period of grace, enforce payment of the Indebtedness by exercising any and all of the rights granted herein" and further may exercise "[a]ny and all rights and remedies afforded by the Laws of any applicable jurisdiction, the Loan Documents or as otherwise afforded by any Laws or equity")

> b.   June 2008 Loan Agreement § 6(q), § 7 (An Event of Default under the June 2008 Loan Agreement exists if DR "shall default under any other loan or indebtedness from [TCB] to DR" and, "[u]pon the occurrence of an Event of Default, [TCB] shall have the immediate right, at the sole discretion of [TCB] and without notice or demand (a) to declare the entire unpaid balance of the Note and all accrued but unpaid interest at once immediately due and payable (and the same shall be at once immediately due and payable and the same may be collected forthwith) . . . and (c) to exercise any of [TCB's] other rights, powers, recourses and remedies

under the Note or any of the other Loan Documents, or at law or in equity.")

c.   <u>Vehicle Note §§ 5-6</u> (DR waived "all notices of nonpayment, demands for payment, presentments for payment, notices of intention to accelerate maturity, notices of actual acceleration of maturity, grace, protests, notices of protest, and any other demands or notices of any kind" and agreed that, upon an Event of Default, TCB may "(a) declare the entire unpaid balance of principal . . . and accrued, unpaid interest upon this Note to be immediately due and payable, (b) reduce any claim to judgment . . . and/or (d) without notice of default or demand, pursue and enforce any of [TCB's] other rights and remedies provided under or pursuant to any applicable laws or agreement.")

d.   <u>Real Estate Note §§ 6-7</u> (DR waived "all notices of nonpayment, demands for payment, presentments for payment, notices of intention to accelerate maturity, notices of actual acceleration of maturity, grace, protests, notices of protest, and any other demands or notices of any kind" and agreed that, upon an Event of Default, TCB may "(a) declare the entire unpaid balance of principal . . . and accrued, unpaid interest upon this Note to be immediately due and payable, (b) reduce any claim to judgment . . . and/or (d) without notice of default or demand, pursue and enforce any of [TCB's] other rights and remedies provided under or pursuant to any applicable laws or agreement.")[12]

26.   In their Guaranties, IEDA, Khobahy, and Hafezamini waived, among other things, "presentment for payment, notice of nonpayment, protest, demand, notice of protest, notice of intent to accelerate, notice of acceleration, [and] notice of dishonor" and further waived "the taking of any other action by [TCB], including, without limitation, giving any notice of default or any other notice to, or making any demand on [DR], any other guarantor of all or any part of the Guaranteed Indebtedness or any other party." Guaranties, § 7.   Further, IEDA, Khobahy, and Hafezamini agreed that "[s]hould [TCB] seek to enforce the obligations of Guarantor hereunder by action in any court or otherwise, Guarantor waives any requirement,

---

[12] *See also* Deed of Trust § 6.1 ("upon the occurrence of an Event of Default, [TCB] [had] the option of declaring all Indebtedness in its entirety to be immediately due and payable."); Pledge Agreement § 7(h) (DR waived all rights to "presentment, demand, notice of intent to demand, notice of intent to accelerate, notice of acceleration, notice of dishonor, protest, and notice of protest, and all other notices with respect to collection, or acceleration of maturity, of the Collateral and Indebtedness.").

substantive or procedural, that (i) [TCB] first enforce any rights or remedies against [DR] or any other person or entity . . . or (ii) [TCB] shall first enforce rights against any collateral." Guaranties, § 7(d).  IEDA, Khobahy, and Hafezamini are each "liable, jointly and severally, with [DR] and any other guarantor of all or any part of the Guaranteed Indebtedness."  Guaranties, § 3.

27.     The Guaranties executed by IEDA, Khobahy, and Hafezamini also provide that "[i]n the event of a default in the payment or performance of all or any part of the Guaranteed Indebtedness, or if an Event of Default occurs under any Loan Document, when all or any portion of the Guaranteed Indebtedness becomes due, whether by its terms, by acceleration or otherwise, Guarantor shall, upon demand, promptly pay the amount due thereon to [TCB]." Guaranties, § 13. The Guaranties are absolute, continuing, and unconditional guaranties of both payment and performance.  Guaranties, § 2-3.

28.     Further, IEDA, Khobahy, and Hafezamini as Guarantors each agreed that:

> [O]bligations under this Guaranty shall not be released, diminished, impaired, reduced, or affected by . . . (ii) any receivership, insolvency, bankruptcy, disability or other proceedings affecting [DR], Guarantor or any other guarantor of all or any part of the Guaranteed Indebtedness, or any of their respective property; (iii) the partial or total release or discharge of Borrower or any other guarantor of all or any part of the Guaranteed Indebtedness . . . or (x) any other circumstance which might otherwise constitute a defense available to, or discharge of, [DR], Guarantor or any other guarantor of all or any part of the Guaranteed Indebtedness."

Guaranties § 8(a).[13]

---

[13] Notably, this provision of the Guaranties, coupled with 11 U.S.C. § 524(e), would allow TCB to sue Khobahy and Hafezamini for the approximately $1.7 million in principal and interest that remains unpaid on the Real Estate Note, notwithstanding DR and IEDA's bankruptcy filings.  At the present time, TCB has elected not to pursue these amounts from Khobahy and Hafezamini, but TCB reserves the right to do so in the future.

C.      **Events of Default and Breaches of Contract**

29.     Events of Default and breaches have occurred and continue to exist under the above-described agreements, including, without limitation, the following:

1.      Violations of Laws

30.     Under the May 2008 Loan Agreement, "[DR] and each Guarantor, as applicable" covenanted to "conduct its business, and affairs in compliance with all Laws."  May 2008 Loan Agreement § 7.1(i).

31.     DR, IEDA, Hafezamini, and Khobahy have failed to comply with § 7.1(i) of the May 2008 Loan Agreement by, among other things, selling vehicles for cash and failing to file reports with the Financial Crimes Enforcement Network ("FinCEN") of cash receipts over $10,000, which can be a felony under 31 U.S.C. §§ 5331 & 5322, and by engaging in other illegal activities, including without limitation the activities that were the subject of the indictment of Hafezamini and another DR employee.

32.     In September 2010, the U.S. Department of Justice, Drug Enforcement Administration ("DEA") Financial Strike Force notified TCB of a pre-existing federal criminal investigation into DR, IEDA, Hafezamini, Khobahy, and other persons associated with DR.  The federal government directed TCB not to terminate any accounts of such persons.

33.     Defendants now allege in this case that TCB made disclosures to federal law enforcement authorities concerning a pre-existing criminal drug-money-laundering investigation of DR, Hafezamini, and Khobahy in connection with an alleged grand jury subpoena and alleged reports of suspicious activity.  TCB is prohibited by federal law from disclosing any documents or other information that would reveal the existence of a grand jury subpoena or whether any suspicious transactions or activities were reported.

34.     According to federal law enforcement officials and as described in more detail in a publicly-filed affidavit used to support the issuance of warrants for the search and seizure of DR's property, during the course of a federal investigation Hafezamini and others acting on behalf of DR sold multiple vehicles to undercover operatives for cash in identified bills represented to be proceeds of unlawful activity, while representing to such operatives that the transactions would not be reported using Forms 8300.  According to federal law enforcement officials, DR's cash sales of vehicles to undercover operatives were not reported to the federal government using Forms 8300.

35.     In February 2011, TCB and federal law enforcement officials learned that certain cash Hafezamini had deposited at TCB contained identified bills from DR's cash vehicle sales to undercover officers.  One or more federal law enforcement officials examined the deposit and confirmed that the identified bills came from the undercover transactions.

36.     In February 2011, TCB and federal law enforcement officials learned that certain cash Khobahy had deposited at TCB contained identified bills from DR's cash vehicle sales to undercover officers.  Khobahy had deposited such cash at TCB despite the fact that it had a distinct odor of marijuana and small remnants of green leafy material that appeared to be marijuana clinging to the bills.  One or more federal law enforcement officials examined the deposit and confirmed that the identified bills came from the undercover transactions.

37.     According to federal law enforcement officials, as of October 27, 2011, DR had *never* filed a Form 8300 with the federal government, despite having made numerous cash sales involving the receipt of currency in excess of $10,000.  Failure to file reports with FinCEN of cash receipts over $10,000 can be a felony under 31 U.S.C. §§ 5331 & 5322.

38.   According to federal law enforcement officials, a purpose of DR's failure to file Forms 8300 was to conceal that DR was receiving cash that it believed to be the proceeds of illegal drug activity.  Laundering money represented to be proceeds of unlawful activity can be a felony under 18 U.S.C. §§ 1956(a)(3)(B) and (2).

39.   The failure of DR, Hafezamini, and Khobahy to comply with Laws was a Potential Event of Default under the May 2008 Loan Agreement, as follows:

a.   May 2008 Loan Agreement, Article 1 ("'Potential Event of Default' means any event or condition which with notice or the lapse of time or both would give rise to an Event of Default")

b.   May 2008 Loan Agreement § 9.1(b) (An Event of Default exists if "[DR] or any Guarantor . . . fails to perform or to observe any covenant or agreement contained herein or in any of the Loan Documents . . . and such failure remains unremedied thirty (30) days following written notice from [TCB].")

c.   May 2008 Loan Agreement § 7.1(i) ("[DR] and each Guarantor, as applicable" covenanted to "conduct its business, and affairs in compliance with all Laws")

40.   Further, the failure of DR to comply with Laws entitled TCB to exercise all remedies available under the May 2008 Loan Agreement without providing DR with notice or an opportunity to remedy the breaches.  Section 9.1(i) of the May 2008 Loan Agreement provides that:

Notwithstanding any other provision relating to notices and opportunities to remedy defaults contained in this Agreement, if a Potential Event of Default exists because of a willful breach by [DR] of any representation, warranty, or covenant contained in this Agreement . . . and if such Potential Event of Default would adversely affect the rights of [TCB] in relation to other creditors of [DR] prior to expiration of the cure period for such Potential Event of Default, then [TCB] may exercise the remedies set forth in [the Loan Agreement] without giving such notice and opportunity to remedy such event or condition.

41.   By and through Hafezamini, Khobahy, and other DR agents, DR willfully breached the May 2008 Loan Agreement's covenant to comply with all Laws.  DR's conduct

was willful because, among other things, DR's agents smelled the marijuana odor on the bills deposited at TCB, counted marijuana-laced currency on a DR desk before depositing it at TCB,[14] intentionally failed to file currency reports, and attempted to conceal suspected ties between the funds received and illegal drug activity.[15]

42.     DR's willful breaches adversely affected the rights of TCB in relation to other creditors of Borrower, because at any point during the investigation, government agents could have seized any portion of DR's real or personal property including without limitation vehicle inventory, premises, cash, bank accounts, books, records, and computers – which were TCB's collateral – as a result of the breaches.  Upon such seizure, TCB's rights would have been adversely affected because, among other things, governmental creditors (*e.g.*, the IRS and the DEA) would have greater abilities to satisfy their debts from DR's assets than would TCB.

2.     Indictments of Bahman Hafezamini and Jose Jimenez

43.     According to public records and federal law enforcement officials, on or about November 9, 2011, a federal grand jury in the Eastern District of Texas indicted Hafezamini and Jose Jimenez, who is or was an employee of DR, for money laundering in connection with their operation of DR (the "Indictments").

44.     While the Indictments remained sealed until November 16, 2011, public records indicate that the phrase "SEALED INDICTMENT as to Bahman Hafez Amini . . . [and] Jose Ivan Jimenez" was entered on the electronic docket in Case No. 4:11-CR-234 on November 10, 2011.

---

[14] *See* Application for a Search Warrant, Dkt. No. 1 in Case No. 3:11-MJ-532 before the United States District Court for the Northern District of Texas, at ¶ 22 & ¶ 26.

[15] *See* Application for a Search Warrant, Dkt. No. 1 in Case No. 3:11-MJ-532 before the United States District Court for the Northern District of Texas, at ¶ 8.  Hafezamini was ultimately indicted for four counts of money laundering as a result of the federal investigation.  Indictment, Dkt. No. 1 in Case No. 4:11-CR-00234-RAS-DDB.  TCB incorporates by reference the Application for Search Warrant and the Indictment.

45.     Also on or about November 10, 2011, federal law enforcement officials informed TCB that, because of the Indictments, warrants would be served on November 16, 2011, involving the seizure of DR's property, including vehicles, books, records, and computer equipment at both of DR's locations and arrests of Hafezamini and Jimenez.  Importantly, even a sealed indictment may be disclosed to a third party like TCB when it is "necessary to issue or execute a warrant or summons."  FED R. CRIM. P. 6(e)(4).

46.     Federal law enforcement officials informed TCB that unless TCB committed to sign a Secured Party Indemnity Agreement for specified vehicles which served as TCB's collateral, such vehicles would be seized.  On or about November 10, 2011, TCB committed to sign the Secured Party Indemnity Agreement.  Thereafter, TCB provided a vehicle inventory as federal law enforcement officials requested, and executed the Secured Party Indemnity Agreement, which government officials completed on or about November 21, 2011.

47.     Further, federal law enforcement officials informed TCB that, regardless of the Secured Party Indemnity Agreement, certain DR property, including DR's books, records, and computer equipment, would be seized.  Such books, records, and computer equipment served as part of TCB's collateral.

48.     On November 15, 2011, United States Magistrate Judges Amos Mazzant and Irma Ramirez issued warrants to search multiple DR locations and seize certain DR property including books, records, computer equipment, and other assets that were TCB's collateral.  On November 16, 2011 at approximately 9:00 a.m., these search warrants were executed, and federal law enforcement officials seized certain of DR's property including books, records, computer equipment, and other assets.

49.     Hafezamini and Jimenez were arrested on November 16, 2011 on four counts of money laundering.

50.     The Indictments, searches, seizures, and arrests, and the alleged illegal conduct on which they were based, adversely affected TCB's security interest in its collateral, jeopardized the collateral itself (some of which was seized), and materially lessened the prospect that DR or any guarantor would repay the amounts owed to TCB.  For example, a halt in DR's operations due to the Indictments, the unavailability of Hafezamini – DR's designated "key man" – to run DR's business, and the searches and seizures had a high likelihood of rendering DR and its owners and principals unable to run DR and unable to safeguard, maintain, and liquidate vehicles (which served as TCB's collateral) in an orderly manner and in a way that would maximize value.

51.     In light of the threatened seizures of DR's property – all of which was TCB's collateral – and the Secured Party Indemnity Agreement, on November 16, 2011, TCB sought a receivership over DR's business so that it could be operated under court supervision.  Particularly since Hafezamini – DR's "key man" – had been indicted and was going to jail as a result of criminal activity in connection with DR's business, TCB's actions were justified, reasonable, and in good faith.

52.     The Indictments, searches, seizures, and arrests, and the alleged illegal conduct on which they were based, represented a material adverse change in the business, operations, and financial condition of DR, IEDA, Khobahy, and Hafezamini.  Unsurprisingly, TCB deemed itself insecure.  That declaration was made in good faith.

53.     Thus, the Indictments, searches, seizures, and arrests were Events of Default under the following contractual provisions:

a.      <u>May 2008 Loan Agreement § 9.1(o)</u> ("[DR] or any Guarantor suffers a material adverse change in its business or financial condition")

b.      <u>June 2008 Loan Agreement § 6(p)</u> ("If [TCB] in good faith (i) believes that an act, event, condition or circumstance exists or has occurred that would materially and adversely affect the Property or the business, operations, condition (financial or otherwise), or assets of any Obligated Party, the ability of any Obligated Party to perform its obligations under any of the Loan Documents to which it is a party or by which it is bound, or the enforceability of any of the Loan Documents, or (ii) deems itself insecure").

c.      <u>May 2008 Loan Agreement § 9.1(n)</u> ("[TCB], in good faith, shall deem itself insecure")

d.      <u>June 2008 Loan Agreement § 6(q)</u> ("If [DR] shall default under any other loan or indebtedness from [TCB] to [DR]").

e.      <u>Real Estate Note § 7(B)</u> ("A Default or Event of Default occurs under any Loan Document")

f.      <u>Vehicle Note § 6(B)</u> ("A Default or Event of Default occurs under any Loan Document")

g.      <u>Deed of Trust § 5.3</u> ("An Event of Default occurs under the Loan Agreement")

h.      <u>Deed of Trust § 5.8</u> ("A default or event of default shall occur and be continuing after the expiration of any applicable grace and/or notice and cure period under any other written agreement (which is not a Loan Document) between [TCB] and [DR]").

i.      <u>Pledge Agreement § 5(a)</u> ("An Event of Default occurs under the Loan Documents")

j.      <u>Pledge Agreement § 5(e)</u> ("Any sale, transfer, encumbrance or other deterioration or impairment of the Collateral or any part thereof").

3.      <u>False Representations in Compliance Certificates, Incurrence of and Failure to Disclose Debt, Making of Unauthorized Loans, and Actual or Attempted Changes in DR's Ownership</u>

54.     On numerous occasions, in connection with the Loan Agreements and other loan documents referenced above, DR submitted Compliance Certificates to TCB signed by Defendant Hafezamini.

55.     Beginning no later than the Compliance Certificate for the trailing twelve months ended December 31, 2008, and continuing at least through the Compliance Certificate for the trailing twelve months ended June 30, 2011, each Compliance Certificate DR submitted to TCB stated that "[DR] has not incurred or assumed any Debt other than the Indebtedness and other than trade payables incurred in the ordinary course of business."

56.     Further, beginning no later than the Compliance Certificate for the trailing twelve months ended September 30, 2008, and continuing at least through the Compliance Certificate for the trailing twelve months ended June 30, 2011, each Compliance Certificate submitted by DR to TCB stated that "to the best of owner's knowledge, the ownership of [DR] has not changed during the Subject Period."

57.     Each Compliance Certificate referenced in paragraphs 54-56 was materially false, because DR had incurred numerous forms of Debt other than its Indebtedness to TCB which were not trade payables incurred in the ordinary course of DR's business.  This Debt was owed to various persons and entities, including without limitation one or more of the following:  Abdee Molavi, Abdollah Adloo, Abdollah Nouri, Ali Hafezamini, Rahim Hafezamini, Russell Jabari, Alberto Dal Cin, and AZAR Capital Investments.   Indeed, DR's Third Amended Plan of Reorganization admits that many of these "persons [have] loaned money to [DR] for the purpose of realizing income through the payment of interest."[16]

58.     TCB further and reasonably believed that DR had breached its loan agreements by obtaining a loan from Automotive Finance Corporation ("AFC"), and by attempting to grant competing security interests to AFC, in 2011.  TCB learned that AFC had filed UCC Financing

---

[16] Order Confirming Corrected Third Amended Plan of Reorganization, as Modified [Dkt. No. 512 in Case No. 11-43725 before the United States Bankruptcy Court for the Eastern District of Texas] at Ex. A § VI.B (referencing Molavi, Adloo, Nouri, Ali Hafezamini, Rahim Hafezamini, and Jabari).

Statements with the Texas Secretary of State on October 12, 2011, asserting a security interest in all of DR's assets and properties.  TCB had a right to rely upon these public records.

59.    Each Compliance Certificate pertaining to periods after April 15, 2011, was materially false, because or about on that date Alberto Dal Cin, Hafezamini, and Khobahy either made or agreed to make Dal Cin a one-third partner in DR.  This change or purported change in DR's ownership contradicts the representations in each Compliance Certificate that DR provided to TCB after April 15, 2011, which stated that "to the best of owner's knowledge, the ownership of [DR] has not changed during the Subject Period."

60.    In the years prior to its bankruptcy, DR made loans or extensions of credit to various persons and entities including, without limitation, one or more of the following:  Bahman Hafezamini, Bahman Khobahy, and AZAR Capital Investments.  By doing so, DR breached its loan agreements.

61.    Thus, the events described in this section III.C.3 were Events of Default under, among others, the following contractual provisions:

a.    <u>May 2008 Loan Agreement § 9.1(b)</u> ("Any representation or warranty previously, presently or hereafter made by or on behalf of any Obligated Person in connection with any Loan Document is incorrect, false or misleading in any respect when made or deemed to be made.")

b.    <u>May 2008 Loan Agreement § 9.1(o)</u> ("[DR] or any Guarantor suffers a material adverse change in its business or financial condition")

c.    <u>June 2008 Loan Agreement § 6(p)</u> ("If [TCB] in good faith (i) believes that an act, event, condition or circumstance exists or has occurred that would materially and adversely affect the Property or the business, operations, condition (financial or otherwise), or assets of any Obligated Party, the ability of any Obligated Party to perform its obligations under any of the Loan Documents to which it is a party or by which it is bound, or the enforceability of any of the Loan Documents, or (ii) deems itself insecure").

d.    <u>June 2008 Loan Agreement § 6(q)</u> ("If [DR] shall default under any other loan or indebtedness from [TCB] to [DR]").

e.       <u>Real Estate Note § 7(B)</u> ("A Default or Event of Default occurs under any Loan Document")

f.       <u>Vehicle Note § 6(B)</u> ("A Default or Event of Default occurs under any Loan Document")

g.       <u>Deed of Trust § 5.3</u> ("An Event of Default occurs under the Loan Agreement")

h.       <u>Deed of Trust § 5.8</u> ("A default or event of default shall occur and be continuing after the expiration of any applicable grace and/or notice and cure period under any other written agreement (which is not a Loan Document) between [TCB] and [DR]").

i.       <u>Pledge Agreement § 5(a)</u> ("An Event of Default occurs under the Loan Documents")

62.    Alternatively, the events described in this section III.C.3 were Potential Events of

Default, under, among others, the following contractual provisions:

a.       <u>May 2008 Loan Agreement, Article 1</u> ("'<u>Potential Event of Default</u>' means any event or condition which with notice or the lapse of time or both would give rise to an Event of Default")

b.       <u>May 2008 Loan Agreement § 9.1(b)</u> (An Event of Default exists if "[DR] or any Guarantor . . . fails to perform or to observe any covenant or agreement contained herein or in any of the Loan Documents . . . and such failure remains unremedied thirty (30) days following written notice from [TCB].")

c.       <u>May 2008 Loan Agreement § 7.2(a)</u> (DR covenanted to not, without TCB's prior written consent, "[c]reate, assume or permit to exist any Lien in excess of $50,000.00, including, without limitation, any purchase money security interest, upon any of the properties or assets which it now owns or hereafter acquires . . . .")

d.       <u>May 2008 Loan Agreement § 7.2(b)</u> (DR covenanted to not, without TCB's prior written consent, "[i]ncur or assume any Debt other than the Indebtedness and other than trade payables incurred in the ordinary course of business")

e.       <u>May 2008 Loan Agreement § 7.2(h)</u> (DR covenanted to not, without TCB's prior written consent, "[d]irectly or indirectly loan, invest in, or extend credit to any Person, including any officer, director or shareholder of [DR]")

    f. <u>May 2008 Loan Agreement § 7.2(o)</u> (DR covenanted to not, without TCB's prior written consent, "[p]ermit any change in the ownership or control of [DR], or permit the sale, transfer or conveyance of any shares or other interest in [DR]").

  63. The events described in this section III.C.3 entitled TCB to exercise all remedies available under the May 2008 Loan Agreement, without providing DR with notice or an opportunity to remedy the breaches.  Section 9.1(i) of the May 2008 Loan Agreement provides that:

> Notwithstanding any other provision relating to notices and opportunities to remedy defaults contained in this Agreement, if a Potential Event of Default exists because of a willful breach by [DR] of any representation, warranty, or covenant contained in this Agreement . . . and if such Potential Event of Default would adversely affect the rights of [TCB] in relation to other creditors of [DR] prior to expiration of the cure period for such Potential Event of Default, then [TCB] may exercise the remedies set forth in [the Loan Agreement] without giving such notice and opportunity to remedy such event or condition.

  64. By incurring Debt to others, including without limitation one or more of Abdee Molavi, Abdollah Adloo, Abdollah Nouri, Ali Hafezamini, Rahim Hafezamini, Russell Jabari, Alberto Dal Cin, and AZAR Capital Investments, DR willfully violated the May 2008 Loan Agreement, including § 7.2(b).  By transferring or attempting to transfer interests in DR to others, including without limitation a one third interest in DR to Dal Cin, DR willfully violated the May 2008 Loan Agreement, including § 7.2(o).  To the extent that DR incurred Debt and granted Liens in favor of others including without limitation AFC, DR willfully violated the May 2008 Loan Agreement, including §§ 7.2(a) and 7.2(b).  To the extent that DR made loans to or investments in others such as Hafezamini, Khobahy, and/or AZAR Capital Investments, DR willfully violated the May 2008 Loan Agreement, including § 7.2(h).

  65. DR's willful breaches adversely affected TCB's rights in relation to other creditors of DR, because, at any time while DR owed debts to others, including without limitation one or more of Molavi, Adloo, Nouri, Ali Hafezamini, Rahim Hafezamini, Jabari, Dal

Cin, AFC, and AZAR Capital Investments, these individuals and entities potentially could have asserted rights against DR inconsistent with TCB's rights.  To the extent that AFC or others held purchase-money security interests in DR's assets, AFC or such other lenders potentially could have claimed rights in such assets superior to TCB's rights.  Moreover, if Dal Cin or others actually owned interests in DR, they may have asserted monetary interests or other rights against DR or attempted to influence DR's business in ways that would be adverse to TCB.  Finally, if DR made loans to or investments in others, DR improperly deployed assets and revenue that were TCB's collateral, and thus jeopardized TCB's position with respect to DR's other creditors.

4.    Receivership and Bankruptcies

66.    On November 16, 2011 at approximately 9:36 a.m., TCB sought and obtained a receivership over DR's assets as a result of the events described herein of which TCB was then aware.

67.    On December 12, 2011, DR and IEDA filed voluntary chapter 11 bankruptcy cases.

68.    During the bankruptcies, U.S. Bankruptcy Judge Brenda Rhoades found that:

- "The indictment gave notice it was the ***Government's intent to seek*** from Hafezamini and Jimenez, individually, ***an immediate forfeiture to the United States of all property***, real or personal, involved in the offense or traceable to such property."

- "[T]he DEA took certain actions to seize assets of the Debtors; and the lender, ***TCB, was under pretty severe time constraints to prevent the seizing of the assets and to obtain the appointment of a receiver***."

- "[I]t appears to the Court that there were some exigencies in this case that are different from a lot of ordinary receiverships . . . ."[17]

69.    In the Turnover Order, Judge Rhoades also found that DR was in default at the time TCB sought the receivership, concluding that "[a]s a result of the Indictment and ***certain***

---

[17] Order Granting Receiver's Motion for Payment of Administrative Expense [Dkt. No. 111 in Case No. 11-43725 before the United States Bankruptcy Court for the Eastern District of Texas] at ¶¶ 10-13 (emphasis added).

*defaults triggered in the loan documents*, [TCB] sought and obtained an *ex parte* order appointing a receiver."[18]   Counsel for DR and IEDA expressly agreed to this finding.[19]

70.     The DR receivership and DR and IEDA bankruptcy filings were Events of Default under the various loan documents, including the following contractual provisions:

a.     <u>May 2008 Loan Agreement § 9.1(e)</u> ("A receiver . . . of any Obligated Person, or any of its assets is applied for by court order; an order for relief under any bankruptcy or insolvency Laws is sought after the filing of a petition by or against any Obligated Person")

b.     <u>May 2008 Loan Agreement § 9.1(f)</u> ("Any Obligated Person requests reorganization . . . or similar relief under any provision of any present or future Law")

c.     <u>May 2008 Loan Agreement § 9.1(o)</u> ("[DR] or any Guarantor suffers a material adverse change in its business or financial condition")

d.     <u>June 2008 Loan Agreement § 6(d)</u> ("Any Obligated Party shall commence a voluntary proceeding seeking liquidation, reorganization or other relief with respect to their debts under any bankruptcy, insolvency or similar law")

e.     <u>June 2008 Loan Agreement § 6(p)</u> ("If [TCB] in good faith (i) believes that an act, event, condition or circumstance exists or has occurred that would materially and adversely affect the Property or the business, operations, condition (financial or otherwise), or assets of any Obligated Party, the ability of any Obligated Party to perform its obligations under any of the Loan Documents to which it is a party or by which it is bound, or the enforceability of any of the Loan Documents, or (ii) deems itself insecure")

f.     <u>June 2008 Loan Agreement § 6(q)</u> ("If [DR] shall default under any other loan or indebtedness from [TCB] to [DR]").

g.     <u>Real Estate Note § 7(B)</u> ("A Default or Event of Default occurs under any Loan Document")

h.     <u>Vehicle Note § 6(B)</u> ("A Default or Event of Default occurs under any Loan Document")

---

[18] *See* Turnover Order at 6 (emphasis added).

[19] *Id.* at 20.

      i.      <u>Deed of Trust § 5.3</u> ("An Event of Default occurs under the Loan Agreement")

      j.      <u>Deed of Trust § 5.8</u> ("A default or event of default shall occur and be continuing after the expiration of any applicable grace and/or notice and cure period under any other written agreement (which is not a Loan Document) between [TCB] and [DR]").

      k.      <u>Pledge Agreement § 5(a)</u> ("An Event of Default occurs under the Loan Documents")

**D.    Hafezamini and Khobahy Must Indemnify TCB Against the Counterclaims**

71.    On July 31, 2013, DR and IEDA, Khobahy, and Hafezamini filed three sets of counterclaims against TCB, based on allegations that TCB acted wrongfully by making alleged disclosures to federal law enforcement authorities and grand juries about the illegal conduct described above, obtaining a receivership over DR's assets, and declaring DR in contractual default.

72.    As "Obligated Parties" under the June 2008 Loan Agreement, Hafezamini and Khobahy are jointly and severally obligated to indemnify, defend, and hold TCB harmless from and against:

> [A]ny and all loss, liability, obligation, damage, penalty, judgment, claim, deficiency and expense (including interest, penalties, attorneys' fees and amounts paid in settlement) to which [TCB] . . . may become subject arising out of or based upon a breach or Event of Default by [DR] under [the June 2008 Loan Agreement], or arising out of or in connection with the [real property collateral and buildings thereon] or . . . [TCB's] agreement to extend the Loan to [DR]."

June 2008 Loan Agreement § 8.

73.    Hafezamini and Khobahy thus must jointly and severally indemnify TCB against all claims, judgments, attorneys' fees, costs, and expenses relating to the counterclaims against TCB in this case, because such counterclaims are based on, among other things: (i) Events of Default committed by DR under loan documents including, without limitation, the June 2008

Loan Agreement; (ii) the real property and buildings collateralizing DR's obligations to TCB (which was part of the receivership that Defendants now allege was wrongful); and (iii) TCB's agreement to extend loans to DR, without which DR, IEDA, Khobahy, and Hafezamini would not have filed counterclaims against TCB.

## IV.    CAUSES OF ACTION

**A.      Count 1:   Breach of Contract (Against DR, for Post-Petition Litigation Expenses)**

74.     TCB re-alleges and incorporates by reference all other paragraphs of this pleading as if fully set forth herein.

75.     TCB has incurred and continues to incur attorneys' fees, costs, and expenses in connection with:  (i) consulting attorneys regarding the enforcement of its rights under the Vehicle Note and the Real Estate Note, and enforcing the Vehicle Note and the Real Estate Note; (ii) DR's indebtedness to TCB and the administration and collection thereof; (iii) the loan documents associated with DR's indebtedness to TCB and the transactions and events associated therewith; (iv) the defense and enforcement of the loan documents associated with the Loan Agreements and TCB's actions with respect thereto; (v) the administration, servicing, and collection of DR's loans from TCB; and (vi) TCB's rights with respect to its collateral; including without limitation fees, costs, and expenses incurred while defending against counterclaims relating to DR's indebtedness to TCB and TCB's actions and alleged actions relating thereto. Certain of such fees and expenses arose after DR and IEDA filed their bankruptcy petitions (the "Post-Petition Litigation Expenses").

76.     While the principal and accrued interest on the Vehicle Note have been paid, the Post-Petition Litigation Expenses have not been paid.

77.     As shown above, Events of Default have occurred under the Vehicle Note, the Real Estate Note, the May 2008 Loan Agreement, the June 2008 Loan Agreement, the Deed of Trust, and the Pledge Agreement.  In addition, Potential Events of Default have occurred under the May 2008 Loan Agreement which are sufficient to enable TCB to exercise remedies thereunder.

78.     On November 15, 2011, TCB sent a notice of acceleration to DR, IEDA, Khobahy, and Hafezamini, accelerating and demanding immediate payment of "the outstanding principal balance and all other sums due under" the Vehicle Note, the Real Estate Note, and their associated loan documents, including "collection costs and other reimbursable costs and expenses incurred by [TCB] in connection therewith."  TCB further invoked "its other remedies under Section 9.2 of the Vehicle Loan Agreement and, in general, the Vehicle Loan Documents and the Real Estate Loan Documents and as otherwise available at law or in equity."  By its November 15, 2011 notice of acceleration, TCB thus invoked all rights existing under any loan documents, which rights included indemnification rights and entitled TCB to recover, among other amounts, the Post-Petition Litigation Expenses.  Additionally and alternatively, pursuant to the May 2008 Loan Agreement and the Pledge Agreement, TCB hereby demands that DR indemnify TCB for all Post-Petition Litigation Expenses.

79.     DR breached the Vehicle Note, the Real Estate Note, the May 2008 Loan Agreement, the June 2008 Loan Agreement, the Deed of Trust, and the Pledge Agreement by, among other things, failing to pay all sums due to TCB, including the Post-Petition Litigation Expenses.  As a direct and proximate result of these breaches, TCB has incurred and will incur actual damages, including but not limited to the amount of the Post-Petition Litigation Expenses, for which TCB now seeks recovery.

80.     TCB thus sues DR to recover its Post-Petition Litigation Expenses, which, as shown above, TCB is entitled to recover from DR under the Vehicle Note, the Real Estate Note, the May 2008 Loan Agreement, the June 2008 Loan Agreement, the Deed of Trust, and the Pledge Agreement.

81.     Under TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq*. and applicable provisions of the Vehicle Note, the Real Estate Note, the May 2008 Loan Agreement, the June 2008 Loan Agreement, the Deed of Trust, and the Pledge Agreement, TCB seeks recovery of its attorneys' fees for the preparation, trial, and any appeals of this case (including without limitation all Post-Petition Litigation Expenses), and seeks recovery of the costs and expenses expended to enforce its rights under such agreements.

**B.     Count 2:     Breach of the Guaranties (Against IEDA, Khobahy, and Hafezamini, for Post-Petition Litigation Expenses)**

82.     TCB re-alleges and incorporates by reference all other paragraphs of this pleading as if fully set forth herein.

83.     Under the Guaranties, IEDA, Khobahy, and Hafezamini are obligated to pay all amounts owing from DR to TCB, including without limitation the Post-Petition Litigation Expenses.  IEDA, Khobahy, and Hafezamini are each "liable, jointly and severally, with [DR] and any other guarantor of all or any part of the Guaranteed Indebtedness," which includes the Post-Petition Litigation Expenses.  *See* Guaranties, § 3.

84.     On November 15, 2011, TCB sent a notice of acceleration to DR, IEDA, Khobahy, and Hafezamini, accelerating and demanding immediate payment of "the outstanding principal balance and all other sums due under" the Vehicle Note, the Real Estate Note, and their associated loan documents, including "collection costs and other reimbursable costs and expenses incurred by [TCB] in connection therewith."  TCB further invoked "its other remedies

under Section 9.2 of the Vehicle Loan Agreement and, in general, the Vehicle Loan Documents and the Real Estate Loan Documents and as otherwise available at law or in equity."

85.     Under the Guaranties, IEDA, Khobahy, and Hafezamini are jointly and severally obligated to pay all amounts owing from DR to TCB, including without limitation the Post-Petition Litigation Expenses.  IEDA, Khobahy, and Hafezamini have breached the Guaranties by failing to pay all sums due to TCB, including the Post-Petition Litigation Expenses.  As a direct and proximate result of these breaches, TCB has incurred and will incur actual damages, including but not limited to the amount of the Post-Petition Litigation Expenses, for which TCB now seeks recovery.

86.     TCB thus sues IEDA, Khobahy, and Hafezamini to recover its Post-Petition Litigation Expenses under the Guaranties.

87.     Under Tex. Civ. Prac. & Rem. Code § 38.001 *et seq*. and applicable provisions of the Guaranties and other loan documents, including § 18 of the Guaranties, TCB seeks recovery of its attorneys' fees for the preparation, trial, and any appeals of this case (including without limitation all Post-Petition Litigation Expenses), and seeks recovery of the costs and expenses expended to enforce its rights under the Guaranties.

**C.     Count 3:  Breach of the June 2008 Loan Agreement and the Guaranties (Against Hafezamini and Khobahy, for Failure to Indemnify Against Counterclaims)**

88.     TCB re-alleges and incorporates by reference all other paragraphs of this pleading as if fully set forth herein.

89.     TCB has incurred and continues to incur attorneys' fees, costs, and expenses associated with defending against counterclaims brought by DR, IEDA, Khobahy, and Hafezamini relating to:  (i) Events of Default committed by DR under loan documents including, without limitation, the June 2008 Loan Agreement; (ii) the real property and buildings

collateralizing DR's obligations to TCB; and (iii) TCB's agreement to extend loans to DR (the "Indemnifiable Expenses").

90.     On November 15, 2011, TCB sent a notice of acceleration to DR, IEDA, Khobahy, and Hafezamini, accelerating and demanding immediate payment of "the outstanding principal balance and all other sums due under" the Vehicle Note, the Real Estate Note, and their associated loan documents, including "collection costs and other reimbursable costs and expenses incurred by [TCB] in connection therewith."  TCB further invoked "its other remedies under Section 9.2 of the Vehicle Loan Agreement and, in general, the Vehicle Loan Documents and the Real Estate Loan Documents and as otherwise available at law or in equity."  By its November 15, 2011 notice of acceleration, TCB thus invoked all rights existing under any loan documents, which rights included indemnification rights and entitled TCB to recover, among other amounts, the Indemnifiable Expenses.  Additionally and alternatively, pursuant to the June 2008 Loan Agreement, TCB hereby demands that Khobahy and Hafezamini indemnify TCB for all Indemnifiable Expenses, and further demands that Khobahy and Hafezamini indemnify TCB for any and all settlements or judgments that may result from counterclaims asserted against TCB by DR, IEDA, Khobahy, or Hafezamini.

91.     Khobahy and Hafezamini have breached the June 2008 Loan Agreement by failing to pay all sums due to TCB, including by failing to indemnify TCB for the Indemnifiable Expenses.  As a direct and proximate result of these breaches, TCB has incurred and will incur actual damages, including but not limited to the amount of the Indemnifiable Expenses, for which TCB now seeks recovery.  In the event of a judgment upon or settlement of counterclaims brought by DR, IEDA, Khobahy, or Hafezamini, TCB's damages would include the amount of such judgments or settlements.

92.     Additionally, under the Guaranties, Khobahy, and Hafezamini are jointly and severally obligated to pay the Indemnifiable Expenses.

93.     Despite TCB's demand for payment, Khobahy and Hafezamini have breached the Guaranties by, among other things, failing to pay all sums due to TCB, including the Indemnifiable Expenses.  As a direct and proximate result of these breaches, TCB has incurred and will incur actual damages, including but not limited to the amount of the Indemnifiable Expenses, for which TCB now seeks recovery.  In the event of a judgment upon or settlement of counterclaims brought by DR, IEDA, Khobahy, or Hafezamini, TCB's damages would include the amount of such judgments or settlements.

94.     TCB thus sues Khobahy and Hafezamini under the June 2008 Loan Agreement and the Guaranties to recover its Indemnifiable Expenses, and further demands that Hafezamini and Khobahy indemnify TCB for any and all settlements or judgments that may result from counterclaims brought by DR, IEDA, Khobahy, or Hafezamini against TCB.

95.     Under TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq*. and applicable provisions of the Vehicle Note, the Real Estate Note, the May 2008 Loan Agreement, the June 2008 Loan Agreement, the Deed of Trust, the Pledge Agreement, and the Guaranties, TCB seeks recovery of its attorneys' fees for the preparation, trial, and any appeals of this case (including without limitation all Indemnifiable Expenses), and seeks recovery of the costs and expenses expended to enforce its rights under such agreements.

## V.      REQUEST FOR RELIEF

WHEREFORE, as specified above, TCB respectfully requests that the Court order that TCB have judgment for:

a.      the Post-Petition Litigation Expenses;

b.      the Indemnifiable Expenses;

c.      the amount of any settlements or judgments that may result from counterclaims asserted against TCB by DR, IEDA, Hafezamini, or Khobahy;

d.      its attorneys' fees for the preparation, trial, and any appeals of this case, expenses, and court costs; and

e.      such other and further relief to which TCB is entitled.

Respectfully submitted,

By: */s/ George M. Kryder*
George M. Kryder
  State Bar No. 11742900
  gkryder@velaw.com
Matthew W. Moran
  State Bar No. 24002642
  mmoran@velaw.com
Jordan W. Leu
  State Bar No. 24070139
  jleu@velaw.com
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201-2975
Telephone:  (214) 220-7700
Fax:  (214) 220-7716

*Attorneys for Texas Capital Bank, N.A.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument was served on all counsel of record on March 17, 2014, through the CM/ECF system.

*/s/ George M. Kryder*
George M. Kryder

US 2332064