

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **TEXAS CAPITAL BANK, N.A.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **Case No. 4:13cv625** |
| | § | |
| **DALLAS ROADSTER, LTD., ET AL.** | § | |
| | § | |
| **Defendants.** | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Now before the Court are Plaintiff Texas Capital Bank's ("TCB") Motion No. 1 to Dismiss First Amended Counterclaims of Dallas Roadster, Ltd. ("DR")[1] (Dkt. 44), Plaintiff Texas Capital Bank's Motion No. 2 to Dismiss First Amended Counterclaims of Bahman Khobahy (Dkt. 46), Plaintiff Texas Capital Bank's Motion No. 3 to Dismiss First Amended Counterclaims of Bahman Hafezamini (Dkt. 47), Defendant/Counter-Plaintiff Dallas Roadster, Ltd.'s Motion for Partial Summary Judgment (Dkt. 101), and Plaintiff Texas Capital Bank's Motion for Summary Judgment on All Claims and Counterclaims (Dkt. 104). The undersigned United States Magistrate Judge makes the following findings regarding the parties' claims.

---

[1]As with the parties' briefing, for ease of reference Defendant and Counter-Claimant Dallas Roadster and its general partner, Defendant IEDA Enterprise, Inc., both are referred to herein as "DR" and the Court's findings extend accordingly.

For several years, TCB had a business relationship with Dallas Roadster Ltd., a Texas limited partnership. Sometime in 2008, DR signed two notes and related security agreements. One note was in essence a revolving line of credit (Exhibit B-1), and the other was for refinancing of certain real estate (Exhibit B-7). *See* Dkt. 104-2 at 3 ("Loan and Security Agreement"); Dkt. 104-2 at 79 ("Loan and Security Agreement"). Over the years there were various extensions of the $4,000,000 line of credit note. The last extension was to run from September 15, 2011 until December 15, 2011. (Exhibit B-5). *See* Dkt. 104-2 at 58 ("Loan Modification, Renewal, and Extension Agreement."). Guaranties were obtained from three Guarantors, the general partner, IEDA Enterprise, Inc., and Bahman Khobahy, and Bahman Hafezamini, all principals in DR. Each guarantor and DR (all of whom are Defendants herein) made certain representations and warranties in consideration for the notes. Under the loan agreement, these representations and warranties survived until all indebtedness was paid in full to the Lender and all Lender's obligations to Borrower were terminated (Exhibit B, Section 10.2). Defendants warranted that they were not in violation of any laws (Section 6.11). *See* Dkt. 104-2 at 14; 25. There were no existing liabilities (Section 6.9). *See* Dkt. 104-2 at 14. There were no defaults under the loan documents (Section 6.8). *Id.* Defendants warranted that there were no liens on any personal property (Section 6.5). *See* Dkt. 104-2 at 13.

Defendants also made affirmative covenants. Most notably, each promised to conduct its business and affairs in compliance with all Laws (Section 7.1(i)). *See* Dkt. 104-2 at 16. Additionally, DR agreed not to incur any indebtedness other than trade payables in the ordinary

course of business or make any payments on other debt without TCB's prior written consent (Section 7.2(b)). *See* Dkt. 104-2 at 18. DR also agreed not to grant a security interest on any of its assets (Section 7.2(k)). *Id.*

In the Unlimited Guaranty Agreements (Exhibits B-2, 3 and 4), the Guarantors waive and release all claims, causes of action, defenses and offsets for any act or omission of TCB in connection with TCB's administration of the indebtedness, except for TCB's wilful misconduct and gross negligence (Section 7(e) of the various Guaranty Agreements). *See* Dkt. 104-2 at 35, 38, 43, and 51. Guarantors also agree that no defense or discharge of DR as principal affects their obligations. *Id.* Section 8(a)(x). Later on, the Guarantors will also release future claims in exchange for a forbearance of default (Exhibit 6). *See* Dkt. 104-2 at 76-78.

Under the Default provision of the DR loan agreement, an event of default existed if any prior warranty or representation made in the loan document is incorrect, false or misleading in any respect when made or deemed to be made (Section 9.1(d)). *See* Dkt. 104-2 at 21.

It appears from the summary judgment evidence that TCB knew for some time prior to accelerating the notes that Hafezamini was possibly violating Treasury regulations. TCB also knew that the DEA was investigating Hafezamini and DR and that it knew of the cash deals being made and not reported according to Treasury regulations. Further, it also appears that TCB suspected that marijuana was in one of the deposit bags brought in by DR. After the fact, TCB learned that DR and Hafezamini had been in violation of the loan agreement by paying back indebtedness without the consent of TCB.

TCB sent all Defendants its final notice of default on November 15, 2011. *See* Dkt. 104-3 at 81. In that notice, TCB stated that, although Hafezamini had represented that no financing would be obtained from American Finance Corporation (AFC), TCB was in receipt of a letter from AFC indicating that it had or expected to acquire a purchase money interest in all of DR's properties and assets. Further, TCB stated that it had recently learned that AFC had filed a UCC financing statement with the Secretary of State. TCB then went on to state that it had been advised that several recent model vehicles had appeared on the dealer lots which were not financed by TCB.

TCB deemed itself to be insecure under the loan documents and also contended that one or more of Defendants had suffered a material adverse change in its business or financial condition. As to the AFC financing agreement, the evidence demonstrates that TCB knew such financing was not going forward, but it is unclear when TCB actually found out about the blanket financing statement filed by AFC. TCB was well apprised that the issue regarding AFC's potential financing was a nonissue particularly since TCB would not sign an Inter Creditor Agreement. However, TCB also deemed itself insecure as a reason for notice of default. This is tempered by the fact that TCB must in good faith deem itself insecure.

By DR's account it was a good customer and all payments were timely made. The genesis of the parties' unraveling relationship appears to begin with a grand jury subpoena issued on TCB concerning DR and one of its principals, Hafezamini. Sometime in the fall of 2010, well over a year before the fallout occurred, TCB was on notice that the DEA was investigating DR and Hafezamini

for drug money laundering. It appears that the DEA was tipped off to irregularities in the dealership as early as 2008.

Thereafter, TCB became more vigilant in monitoring DR's activities, going to the extraordinary measure of putting two of its own auditors on site to monitor DR's activities. TCB also reminded Hafezamini that he was required to follow certain regulations when taking in large cash deposits for the purchase of cars. Hafezamini denies that TCB informed him of this.

In June 2011, TCB notified DR that it was in default for failure to furnish Annual Reviewed Financial Statements but agreed to forebear further action if the default was cured. DR apparently cured the default because no further action was taken on the June letter.

Then, in October 2011, TCB notified DR that, if it had obtained financing from AFC, it was in potential default. TCB requested that DR respond in writing that it had not obtained the financing. According to written discovery, it appears that TCB was told by AFC that no financing would take place without a Inter Creditor Agreement which TCB refused to give. For some reason, DR did not respond in writing, but it appears one of the principals informed TCB that no such financing had been obtained. In this same time period, AFC also filed financing statements with the Texas Secretary of State. It is unclear exactly when TCB was aware of this even though no financing had been obtained.

By early November 2011, TCB knew that the DEA had its sights on DR. The DEA sent TCB a Secured Party Indemnity Agreement. This agreement purportedly protected TCB and its collateral from sale, if seized. On November 9, 2011, the DEA met with TCB representatives to inform them

that an indictment against Hafezamini and another employee of DR had been returned and that the DEA was going to arrest Hafezamini, as well as seize vehicles, on November 16, 2011. For some period of time going back several months, TCB had been cooperating with the DEA in its investigation and furnishing records when requested.

On November 15, 2011, TCB sent all Defendants a notice of acceleration and cross default and acceleration in reference to the $4,000,000 line of credit and the real estate note in the sum of $2,067,945.00. In the letter TCB referenced the October 26, 2010 letter but also mentioned that several vehicles appeared on Borrowers' lots which were not financed under the credit agreement. TCB also mentioned that the documents allowed it to accelerate the loan if it deemed itself to be insecure. TCB also demanded immediate possession of all vehicles and collateral. Notice was also given to all Guarantors.

On November 16, 2011, TCB filed its Original Petition and Emergency Application for Appointment of a Receiver in state court. This was filed at 9:06 a.m. *See* Dkt. 104-19. Approximately an hour later, the state court district judge signed the order for receivership. *See* Dkt. 104-20. Defendants contend that the receivership was obtained in bad faith. In his deposition, Noonan stated that TCB had a "feeling of insecurity" for months but the November 10 meeting was the catalyst for TCB's actions. Noonan testified that at the meeting the DEA informed him of the indictments and the upcoming seizure of DR's property including vehicles. Defendants also took the deposition of the DEA agent involved, and he denies telling TCB that all property including vehicles would be seized.

Three search warrants were obtained. One was obtained in the Northern District of Texas, and two were for property in the Eastern District of Texas. The indictment also sought a general forfeiture of all assets of DR related to the criminal activity.

Ultimately, DR and IEDA filed for voluntary chapter 11 bankruptcy, and the dispute with TCB became an adversarial proceeding therein. This case is pending in this Court by virtue of an order withdrawing the order of reference.

TCB's First Amended Complaint asserts the following claims: (1) breach of contract against DR; (2) breach of the guaranties against IEDA, Khobany, and Hafezamini; and (3) breach of the June 2008 loan agreement and the guaranties against Hafezamini and Khobahy. Dkt. 36. DR and IEDA's First Amended Counterclaims assert the following claims against TCB: (1) breach of contract; (2) negligent misrepresentation; (3) wrongful receivership; and (4) a declaration of common law partnership or its equivalent. Dkt. 38. In addition to adopting all causes of action alleged by DR, Hafezamini asserts the following claims in his First Amended Counterclaim: (1) malicious prosecution of civil and/or criminal proceedings; (2) abuse of process; (3) intentional infliction of emotional distress; (4) tortious interference with existing contracts and prospective relations; (5) fraud/fraud in the inducement/deceptive trade practices; (6) promissory estoppel; (7) wrongful receivership; and (8) Equal Credit Opportunity Act violations. Dkt. 39. Khobahy asserts the following counterclaims against TCB: (1) breach of contract; (2) tortious interference with existing contract and prospective relations; (3) wrongful receivership; (4) conversion; (5) fraud; (6) intentional infliction of emotional distress; (7) negligent misrepresentation; (8) defamation/business

disparagement; (9) promissory estoppel; (10) unjust enrichment; (11) money had and received; (12) Texas Theft Liability Act violations; and (13) Equal Credit Opportunity Act violations. Dkt. 33. Pending before the Court are several dispositive motions addressing the claims raised herein.

In its motion to dismiss DR's counterclaims, TCB argues that: (1) TCB is immune from liability for its alleged disclosures to law enforcement authorities; (2) no claim for "wrongful receivership" can be stated; (3) DR expressly waived consequential damages and cannot re-litigate the receivership order under the guise of a contract claim; (4) DR has not plausibly pled fraud or negligent misrepresentation; (5) DR fails to plausibly allege a common law or equitable partnership; and (6) DR expressly waived a jury trial and its improper jury demand must be stricken. *See* Dkt. 44. In its motion to dismiss the counterclaims of Khobahy, TCB argues: (1) Khobahy improperly asserts claims that belong exclusively to DR under its bankruptcy plan; (2) Khobahy lacks standing to bring the claims he asserts; (3) TCB is immune from liability for his alleged disclosures to law enforcement authorities; (4) Khobahy's variously-labeled counterclaims all fail. *See* Dkt. 46. In its motion to dismiss Hafezamini's counterclaims, TCB argues: (1) TCB is immune from liability for its alleged disclosures to law enforcement authorities; (2) Hafezamini lacks standing to sue over actions toward DR because such claims belong exclusively to DR under its bankruptcy plan; (3) Hafezamini lacks standing to complain that DR was harmed; and (5) Hafezamini's variously-labeled counterclaims all fail. *See* Dkt. 47. Defendants have filed responses in opposition.

In its motion for summary judgment, TCB asks the Court to dismiss all counterclaims against it with prejudice and/or render summary judgment thereon in its favor and to render summary

judgment on all of TCB's affirmative claims.[2]  Specifically, TCB argues: (1) DR defaulted under and materially breached the loan agreement and thus TCB is entitled to summary judgment on it's affirmative claims and on DR's breach of contract claim; (2) the counterclaims fail for lack of recoverable damages; (3) claims based on TCB's alleged disclosures to law enforcement authorities are barred by statutory immunity and fail for lack of evidence; (4) wrongful receivership is not a recognized claim and any receivership-based claims are time-barred; (5) Hafezamini and Khobahy lack standing to bring individual claims based on the default, acceleration, or receivership; (6) Defendants expressly waived all claims against TCB as a condition to TCB's forbearance from default remedies; (7) numerous claims fail for complete lack of evidence on one or more elements and because of claim-specific defects; and (8) all other counterclaims have been abandoned.  *See* Dkt. 104.  In its motion for partial summary judgment, DR seeks summary judgment finding that there was no default related to DR's efforts to secure financing from AFC and finding that TCB had no basis to accelerate the Note in relation to any claimed Automotive Finance Corporation-related default.  *See* Dkt. 101.  The summary judgment motions have also been responded to.

At a hearing in this case, the Court having raised the similarity in the arguments raised, the parties agreed that a ruling on the motions for summary judgment would render the motions to dismiss moot.  Therefore, without finding that any claims have been stated or that the arguments raised in the motions to dismiss lack merit, the Court addresses the parties' motions for summary judgment.

---

[2]TCB also requests a hearing on its motion.  The Court has held numerous hearings and telephone conferences regarding the parties' claims herein.  *See, e.g.,* Dkt. 144, 170.

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna,* 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Prods., Inc.,* 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)). If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson,* 420 F.3d 532, 536 (5th Cir. 2005) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the non-moving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.,* 336 F.3d 410, 412 (5th Cir. 2003). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See King v. Dogan,* 31 F.3d 344, 346 (5th Cir. 1994) (holding that unverified pleadings do not "constitute competent summary judgment evidence"). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 399 (5th Cir. 2008). Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted). In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little,* 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

The Court may make no credibility determinations or weigh any evidence and must disregard all evidence favorable to the moving party that the jury is not required to believe. *See Chaney v. Dreyfus Serv. Corp.,* 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.,* 336 F.3d at 412–13). The Court is not required to accept the non-movant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *Id.* (citing *Reaves Brokerage,* 336 F.3d at 413).

11

TCB first argues that DR defaulted under and materially breached the loan agreement entitling it to summary judgment. Because of the indictment TCB argues that it was entitled to deem itself insecure under the loan agreement. Further, TCB argues that there was a material adverse change in DR's business. These are noted events of default under Section 9.1 of the loan agreement (Exhibit B-1). *See* Dkt. 104-2. Although the meaning "material adverse change " is not defined, one common meaning of "material" is "being of real importance or great consequence." *Webster's Third New International Dictionary* 1392 (2002). "Adverse" means having an opposing or contrary interest. Black's Law Dictionary 10th Ed. "Change" means to become different. *Webster's Third New International Dictionary* 373-374 (2002).

TCB points to a number of other situations where it claims that DR was in default, although these matters were not known to TCB at the time that it declared DR in default and subsequently filed suit for breach of contract  and for a receivership. On written questions, the Assistant U.S. Attorney who handled the case stated that Hafezamini, in his pretrial diversion, unconditionally admitted to committing a felony (Exhibit O). *See* Dkt. 104-17. In the Pre-Trial Diversion agreement, Hafezamini admitted that he was aware that failure to file the required reports was a crime. He admitted that, on 15 occasions, he had failed to file the required reports.

"It is a well established rule that a party to a contract who is himself in default cannot maintain a suit for its breach." *Dobbins v. Redden,* 785 S.W.2d 377, 378 (Tex. 1990). Under the "well-established principles of Texas contract law" exemplified by *Dobbins,* materially breaching

the terms of the Mortgage by failing to make timely payments "would normally [with an exception not relevant here] prevent [Plaintiffs] from maintaining a breach-of-contract claim." *Thomas v. EMC Mortgage*, 499 F. App'x 337, 341 (5th Cir. 2012) (unpublished). Federal district courts applying Texas contract law have invoked that "well-established rule" to bar actions for breach of contract by borrowers who were themselves in breach. *See Manns–Rice v. Chase Home Fin., LLC,* No. 4:11–CV–425–A, 2012 WL 2674551, at *5 (N.D. Tex. July 5, 2012) (holding that where the "summary judgment record shows that plaintiff admitted she became delinquent in the payment of her mortgage loan payments .... [her] failure to perform her contractual obligations warrants summary judgment on her breach of contract claim on that basis alone"); *Chavez v. Wells Fargo Bank, N.A.,* No. 4:11–V C–864–Y, 2013 WL 3762894, at *4 (N.D.Tex. July 9, 2013) (dismissing borrower's breach of contract claim because borrower's allegations demonstrated that he was in default under the deed of trust); *Williams v. Fed. Nat'l Mortg. Ass'n,* No. 2:11–CV–157–J, 2012 WL 1853170, at *2 (N.D.Tex. May 21, 2012) (granting lender summary judgment when "Plaintiffs present no evidence to contradict either their [not responded-to requests for] admissions or the notices of default that show that, at the time of foreclosure, Plaintiffs owed a significant balance due on their mortgage and were in default.").

Defendants maintain that there was no material breach of the agreement because TCB was always in a secure position given the collateral it had. Texas cases generally address the issue of breach in terms of materiality. *See Allied Capital Partners, LP v. Proceed Technical Res., Inc.*, 313 S.W. 3d 460 (Tex. App.– Dallas, 2010 no writ ). If a non breaching party treats the contract as

continuing after a breach, the party is deprived of any excuse for termination of its performance. Materiality is generally a question of fact. *Henry v. Mason*, 333 S.W. 3d 825 (Tex, App.– Houston (1st Dist.) 2010, writ denied).

DR maintains that there was no reason to declare default since TCB was sufficiently collateralized. DR maintains that the indictment was not a material adverse change in DR's business. This issue should proceed to trial, since the evidence unequivocally shows that TCB was well aware of Hafezamini's actions for well over a year but never declared default and even went so far as to extend the line of credit only two months before it declared default.

In addition, what the DEA conveyed to TCB is a matter of dispute. None of the default notices given to DR mention Hafezamini's criminal misconduct. Yet, TCB was clearly on notice of the same for almost a year and was furnishing the DEA information.

The undersigned cannot make credibility determinations on summary judgment, and there is enough conflicting evidence on breach to be submitted to the trier of fact. There is a genuine issue of material fact as to the breach of contract claims between DR and TCB. The question for the District Judge is whether there was a material breach by DR and whether TCB had a good faith basis for its "insecurity."

TCB argues that, in any event, DR waived consequential damages. In the loan document DR waived any right to sue for consequential damages. The parties differ on the meaning of consequential damages. Actual damages are those damages recoverable under common law. *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 939 (Tex.), *cert. denied,* 449 U.S.

1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). Under common law, actual damages are either "direct" or "consequential." *Henry S. Miller Co. v. Bynum,* 836 S.W.2d 160, 163 (Tex.1992) (Phillips, C.J., concurring); *see* RESTATEMENT (SECOND) OF TORTS § 549 (1977) (outlining measure of damages for fraudulent misrepresentation). Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. *See Southwind Aviation, Inc. v. Avendano,* 776 S.W.2d 734, 736 (Tex.App.– Corpus Christi 1989, writ denied); *Anderson Dev. Corp. v. Coastal States Crude Gathering Co.,* 543 S.W.2d 402, 405 (Tex. Civ. App.– Houston [14th Dist.] 1976, writ ref'd n.r.e.). Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. *See Bynum,* 836 S.W.2d at 163 (Phillips, C.J., concurring); *Coastal States,* 543 S.W.2d at 405; Anderson, *Incidental and Consequential Damages,* 7 J.L. & Com. 327, 328 (1987).

Consequential damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex. 1995); *Moore v. Anderson,* 30 Tex. 224, 230 (1867). Under the common law, consequential damages need not be the usual result of the wrong, but must be foreseeable, *see Mead v. Johnson Group, Inc.,* 615 S.W.2d 685, 687 (Tex. 1981), and must be directly traceable to the wrongful act and result from it. *Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.,* 847 S.W.2d 289, 295 (Tex.App.– El Paso 1992, writ denied); *El Paso Dev. Co. v. Ravel,* 339 S.W.2d 360, 363 (Tex. Civ. App. – El Paso 1960, writ ref'd n.r.e.). Still, if damages are too remote, too uncertain, or purely conjectural, they cannot be recovered. *See White v. Southwestern Bell Tel. Co., Inc.,* 651 S.W.2d

260, 262 (Tex. 1983); *see also Bynum,* 836 S.W.2d at 164 (Phillips, C.J., concurring). *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812 (Tex. 1997).

DR pleads the following direct damages: warranty sales, bank commissions, interest income, document fees, and late fees. To the extent it can show these damages and demonstrate a breach, those are recoverable. To the extent it seeks foreseeable profits from other business opportunities lost as a result of the perceived wrongful default, such are consequential damages and may not be recovered. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W. 2d 41, 49 n.1 (Tex. 1998). In addition, to the extent that DR seeks either damages for loss of credit or credit damage and inability to obtain refinancing, such damages are consequential damages and are excluded by DR's contract with TCB. *See Mead v. Johnson Group, Inc.*, 615 S.W2d 685 (Tex. 1981). The above enumerated damages appear to be the only damages pled by DR. Therefore, TCB's motion as to waiver as to consequential damages should be granted.

DR has also sued for negligent misrepresentation, wrongful receivership, and a declaration that TCB through its conduct was in a common law partnership with DR. As to wrongful receivership, there was no appeal of the order and any suit for damages is an impermissible collateral attack on the receivership ordered by the Court. *Loomis Land & Cattle Co. v. Diversified Mortg. Investors*, 533 S.W.2d 420,423 (Tex. Civ. App. – Tyler 1976, writ ref'd n.r.e). The undersigned has addressed much of this in a prior report, and the parties are aware of the Court's position on this issue. *See* Dkt. 168.

There is no allegation that, in the few short weeks of the receivership, the receiver acted outside the parameters of the court order or made false statements to DR's customers. While DR has devoted much effort to discredit TCB and its officers, to the extent it alleges out right perjury, it has not shown any wrongful conduct in the operation of the receivership. Further, any claim about how the receivership order was obtained would lie in an abuse of process claim which it did not plead.

Elements of a claim for the tort of abuse of process include: (1) an illegal, improper, or perverted use of the process, neither warranted nor authorized by the process, (2) an ulterior motive or purpose in exercising such use, and (3) damage as a result of the illegal act. *Graham v. Mary Kay, Inc.,* 25 S.W.3d 749, 756 (Tex.App.– Houston [14th Dist.] 2000, pet denied). Abuse of process is the malicious misuse or misapplication of process in order to accomplish an ulterior purpose. *Baubles & Beads v. Louis Vuitton, S.A.,* 766 S.W.2d 377, 378 (Tex.App.– Texarkana 1989, no writ) (citing RESTATEMENT (SECOND) OF TORTS § 682 (1977)); W. Keeton, *Prosser and Keeton on The Law of Torts* § 6 (5th ed.1984)).

However, the critical aspect of this tort remains the improper use of the process after it has been issued. *Graham,* 25 S.W.3d at 756. Abuse of process exists where the original process is used to accomplish an end other than that which the writ was designed to accomplish. *Bossin v. Towber,* 894 S.W.2d 25, 33 (Tex.App. – Houston [14th Dist.] 1994, writ denied); *see also Baubles & Beads,* 766 S.W.2d at 378; *Martin v. Trevino,* 578 S.W.2d 763, 769 (Tex. Civ. App. – Corpus Christi 1978, writ ref'd n.r.e.). Where process is used for the purpose for which it is intended, even though

accomplished by an ulterior motive, no abuse of process has occurred. *Baubles & Beads,* 766 S.W.2d at 379. "If wrongful intent or malice caused the process to be issued initially, the claim is instead one for malicious prosecution." *Bossin,* 894 S.W.2d at 33. DR alleges neither abuse of process, nor malicious prosecution.

As to DR's request for a declaration of common law partnership or its equivalent, DR was merely a debtor in its dealings with TCB. A debtor creditor relationship alone does not create a fiduciary relationship. *See Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1963). The Court agrees that excessive lender control or influence in the borrower's business activities could result in a fiduciary relationship. *See Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419,442 (Tex. App-Houston [14[th] Dist.] 1998, pet. denied). DR, however, has not pled breach of fiduciary duty but rather a common law partnership based on TCB's actions, which it describes as wrongful. There is no summary judgment evidence to demonstrate a partnership and TCB's motion should be granted as to that claim.

In regard to its negligent misrepresentation claim, DR contends that TCB made material, false representations shortly before and in furtherance of two extensions of the line of credit. DR maintains that, as early as March 15, 2011, it was told to find another lender because TCB was getting out of the car business. However, as admitted by DR, TCB extended the line of credit in March for six months, as it had represented it would. DR contends that it was led to believe that, with the extension, everything was well with its relationship with TCB. It is DR's position that TCB could have done much more at less expense to DR to protect itself.

In regard to the three-month credit extension in September 2011, DR alleges that TCB told it that it was willing to extend for three months but that the actions of TCB caused DR to believe that everything was satisfactory in the relationship. DR points to the fact that during this time TCB was working with outside counsel to file suit on DR. DR states that, if TCB had not told DR that things would work out, DR could have taken steps to pay down the note or make other arrangements to pay it off. DR also points to the securing of the *ex parte* order and false or misleading statements made by Noonan in the petition for a receivership.

The language of the September extension agreement provides as follows:

> This Agreement and the other Loan Documents represent the final agreement between the parties, and this Agreement and the other Loan Documents may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements between the parties. There are no unwritten oral agreements between the parties.

Dkt. 104-2 at 66 (Section 9 of Exhibit B-5).

The Court finds that any fraud or negligent misrepresentation claims cannot succeed since its pleadings fail to satisfy F.R.C.P. Rule 9(b) and moreover there is no evidence that it relied on any statement made by TCB. Any complaint as to fraud or negligent misrepresentation must allege when the representations were made, who made them, and to whom specifically they were made. *Encompass Office Solutions, Inc. v. Ingenix, Inc.* 775 F.2d 938 (E.D. Tex. 2011). Therefore, the only issue remaining between TCB and DR is whether there was a material breach of contract by either party and if so the amount of direct damages flowing from said breach.

TCB has sued the Guarantors under their unlimited guaranties. Essentially, the Guarantors agree that TCB may proceed against them without pursuing DR and without regard to whether it pursues its options as to any collateral. It is a very broad but enforceable guaranty. Based on the plain language of the documents before the Court, summary judgment for TCB should be granted as to those claims.

Bahman Khobahy has filed a counter claim asserting breach of contract; tortious interference with existing contracts and prospective relations; wrongful receivership; conversion; fraud; intentional infliction of emotional distress; negligent misrepresentation; defamation; promissory estoppel; unjust enrichment; money had and received; Texas Theft Act violations; and discrimination under the Equal Credit Opportunity Act.

Bahman Hafezamini adopts those causes of action asserted by DR and also sues for malicious prosecution; abuse of process; intentional infliction of emotional distress; tortious interference with existing contracts and prospective relations; fraud/fraud in the inducement/deceptive trade practices; promissory estoppel; wrongful receivership and violations of the Equal Credit Opportunity Act.

The Guarantors, including Hafezamini and Khobahy, have signed multiple documents waiving various claims. As noted previously, the Guarantors waived and released all claims, causes of action, defenses, and offsets for any act or omission of TCB in connection with TCB's administration of the Guaranteed indebtedness except for TCB's wilful misconduct and gross negligence (Exhibit B-3). *See* Dkt. 104-2 at 46. None of the Guarantors have pled gross negligence.

The term "wilful misconduct" is not defined. Wilful has sometimes been defined as "heedless and reckless disregard' and means "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons affected by it." *Wheeler v. Yettie Kersting Mem. Hosp.,* 866 S.W.2d 32, 50 n. 25 (Tex.App. – Houston [1st Dist.] 1993, no writ) (citing *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 916–20 (Tex. 1981)). The court in *Burk* said that the term is synonymous with "gross negligence." *Burk Royalty,* 616 S.W.2d at 920. If, on the other hand, "willful" means "intentional," then such arises out of an intentional tort. RESTATEMENT (SECOND) OF TORTS § 8A (1965). Black's Law Dictionary defines wilful misconduct in terms of recklessness and intentional (Black's Law Dictionary 8th Ed. 2004). However, the loan agreement contemplates that the guaranties may be amended, which happened at least twice.

Exhibit 5 is the Guarantors' consent to the last extension of credit. *See* Dkt. 104-2 at 67-69. The Guarantors agree that there are no claims or offsets against or defenses or counterclaims to, the indebtedness and other obligations created or evidenced by the loan documents or guaranty agreement and each guarantor hereby waives and releases any such claims, offsets, defenses or counterclaims. In June 2011, DR acknowledged that it was in default and asked for a thirty-day forbearance period to cure the default. In consideration, all Guarantors released all present and future claims in part relating in any manner to the extension, negotiation, or administration of the loan. *See* Dkt. 104-2 at 76-78. TCB argues that the Guarantors have released all counterclaims raised against it.

To release a claim effectively, the releasing instrument must "mention" the claim to be released. *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 20 S.W.3d 692, 698 (Tex. 2000) (discussing *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 938 (Tex. 1991)). But the parties need not anticipate and identify each potential cause of action relating to the subject matter of the release. *Id.* Rather, "a valid release may encompass unknown claims and damages that develop in the future." *Id.* Further, the "mention" requirement does not bar general, categorical releases, but such releases are to be narrowly construed. *Brady,* 811 S.W.2d at 938; *see also Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 422 (Tex. 1984).

Exhibit 6 is a broad release but it specifically mentions future claims based upon any act, event or relationship occurring or existing at any time through the date the letter is executed and relating in any manner to the extension, negotiation or ***administration*** of the loan. *See* Dkt. 104-2 at 77. At the time the letter was executed, TCB and all Guarantors had a relationship and all claims relate to TCB's administration of the loan. For example, most of Hafezamini's claims for defamation occurred prior to June 22, 2011. Claims relating to interference with prospective business relations are based on TCB's relationship with DR and the Guarantors and the notice of default and receivership which relate to the administration of the loan. Therefore, the Court finds that all counterclaims are barred and TCB is entitled to summary judgment thereon.

Notwithstanding the Guarantors three separate releases, the Court finds that Khobahy and Hafezamini could not prevail on their counterclaims. Primarily, Khobahy and Hafezamini's wrongful receiverships claims fail for the same reasons DR's does.

As to any interference with contract claims, Hafezamini's declaration is conclusory and does not sufficiently describe how and to the extent he was damaged. *See* Dkt. 117-12. He only blames that TCB's actions in part forced him to sell his interests in Azar and miss out on other deals. *See* Dkt. 117-12 at 2. Of course, he takes no blame for his own conduct, which he admitted under the penalty of perjury was criminal.

Khobahy's declaration again makes vague references to loss of business opportunities without specifying or identifying what the lost opportunities were. *See* Dkt. 117-47. He does allege that the actions of TCB resulted in a loss of his investment in Azar Capital, but TCB states that such arose out of another lawsuit between the parties on separate guaranties.

As to interference with prospective business relations, there must be an independent tort. As the Texas Supreme Court has noted, the historical limitation of the tort to unlawful conduct serves this purpose. *Wal-Mart Stores Inc., v. Sturges*, 52 S.W.2d 711 (Tex. 2001). The court, in citing to the *Restatement (Second) of Torts*, noted that the actors's conduct is characterized by violence, fraud or defamation. *Id*. At 726. There has been no showing that TCB acted with violence or made defamatory comments to Hafezamini's and Khobahy's prospective customers. Further, whether TCB had a good faith belief that it was insecure is not tantamount to fraud. Actions that are merely sharp or unfair are not actionable. *Id*.

As to fraud and negligent misrepresentation, Khobahy and Hafezamini argue that they were "set up." They allege that TCB misrepresented the reason for auditors to be on site. They allege that TCB misrepresented the basis for seeking a modification during the audit process and that TCB was

aware of the sting operation. At a minimum, Rule 9(b) requires allegations of the particulars of time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. *See DT Apartment Group, LP v. CW Capital , LLC*, 2012 WL 6693192 (N.D. Tex. 2012). Khobahy and Hafezamini's pleadings fall short of the heightened pleading standard, and, as stated previously, they have waived such claims.

Neither can Khobahy and Hafezamini recover for intentional infliction of emotional distress. This "gap filler" tort is not available as a cause of action unless the actor intended to cause severe emotional distress, or such distress is a primary risk of the conduct at issue. *See Conley v. Driver*, 175 S.W.3d 882 (Tex. App.– Texarkana, 2005, pet. denied). As Khobahy and Hafezamini admit, the actions were directed toward DR and its default and TCB's request for a receivership. There is no allegation that TCB intended to cause Khobahy and Hafezamini emotional distress.

As to defamation and business disparagement, Khobahy has admitted in his deposition that he was not aware of any defamatory statements made by TCB as to him.

As to promissory estoppel, Khobahy and Hafezamini allege that certain promises were made by TCB. They allege that TCB alleged that the auditors were in the business as a routine matter, that the relationship with TCB was solid, and that there was no reason to seek alternative financing. To show promissory estoppel, a party must show a promise, foreseeability of reliance, and substantial reliance to his detriment. *G.D. Holdings, Inc. V. H.D.H. Land &Timber, L.P.*, 407 S.W.3d 856 (Tex. App.– Tyler, 2013, no writ). Promissory estoppel does not create a contract right that does not otherwise exist. *See Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 734 (Tex. 1981). And

the law in Texas is clear that when the contract comprises the disputed promise, recovery is precluded under promissory estoppel. *Thaver v. Zapata Off-Shore Co.*, 903 F.2d 381, 385 (5th Cir. 1990).

Neither has Khobahy shown what personal property which belonged to him was confiscated by TCB. He cannot recover on his unjust enrichment, conversion, or money had and received claim.

As to the claim of malicious criminal prosecution, to the extent not waived, there is summary judgment evidence indicating Hafezamini, in his pretrial diversion, unconditionally admitted to committing a felony. *See* Dkt. 104-17. He has not demonstrated a fact issue as to his innocence *See Martinez v. English*, 267 S.W.3d 521, 527 -528 (Tex. App.–Austin 2008, no pet.) (to successfully assert a claim of malicious prosecution, a plaintiff must show he was innocent of the charges). For this reason, his abuse of process claim also fails.

Khobahy and Hafezamini have also abandoned their claims for Texas Theft Liability Act, malicious civil prosecution and ECOA by failing to respond to such in his response to the motion to dismiss or in response to TCB's motion for summary judgment.

## **RECOMMENDATION**

Defendant/Counter-Plaintiff Dallas Roadster, Ltd.'s Motion for Partial Summary Judgment (Dkt. 101) should be DENIED in its entirety, Plaintiff Texas Capital Bank's Motion for Summary Judgment on All Claims and Counterclaims (Dkt. 104) should be GRANTED as to all claims except TCB's breach of contract claim and DR's breach of contract counterclaim and DENIED as to the breach of contract claims; Khobahy and Hafezamini should take nothing by their counterclaims and

those claims should be dismissed with prejudice; DR should take nothing by its counterclaims of fraud, negligent misrepresentation, wrongful receivership, and the claim seeking a declaration of common law partnership or its equivalent and those claims should be dismissed with prejudice.

Further, given the rulings on the summary judgment motion, Plaintiff Texas Capital Bank's Motion No. 1 to Dismiss First Amended Counterclaims of Dallas Roadster, Ltd. (Dkt. 44), Plaintiff Texas Capital Bank's Motion No. 2 to Dismiss First Amended Counterclaims of Bahman Khobahy (Dkt. 46), and Plaintiff Texas Capital Bank's Motion No. 3 to Dismiss First Amended Counterclaims of Bahman Hafezamini (Dkt. 47) should otherwise be DENIED as MOOT.

The only claims remaining should be TCB's breach of contract claim against DR and DR's breach of contract claim against TCB and any applicable claims for attorney's fees. All other claims for relief are DENIED.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(c).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *Id.; Thomas v. Arn*, 474 U.S. 140,

148 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc),

*superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections

from ten to fourteen days).

**SIGNED this 4th day of March, 2015.**


_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE